UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 18- 10013 RGS |
| v. | ) | |
| | ) | |
| (1) GARY P. DECICCO, and | ) | 18 U.S.C. § 1349 (Fraud Conspiracy and Attempt); |
| (2) PAMELA M. AVEDISIAN, | ) | 18 U.S.C. § 1343 (Wire Fraud); |
| | ) | 18 U.S.C. § 1344 (Bank Fraud); |
| Defendants | ) | 18 U.S.C. § 1957 (Unlawful Monetary Transactions); |
| | ) | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), (a)(2)(A) and |
| | ) | 28 U.S.C. § 2461(c) (Criminal Forfeiture) |

**INDICTMENT**

The Grand Jury charges that:

**General Allegations**

1.      At times relevant to this Indictment, the defendant, GARY P. DECICCO, was a resident of Nahant, Massachusetts.

2.      At times relevant to this Indictment, the defendant, PAMELA M. AVEDISIAN, was a resident of Nahant or Ashland, Massachusetts.

3.      In or around September 2013, DECICCO agreed with the Internal Revenue Service (the IRS) that his outstanding federal tax obligation for the tax years 2008, 2009, 2010 and 2011 was approximately $342,000.  In or around March 2013, DECICCO had agreed to make monthly payments to the IRS in the amount of $3,300, towards his outstanding tax obligation.  From in or around March 2013 until in or around March 2015, DECICCO made 22 payments, each in the amount of $3,300, towards his tax obligation.  DECICCO also made a $3,000 payment in December 2016, and a $3,000 payment in March 2017.  As of September 2016, DECICCO owed approximately $340,000 to the IRS, which sum included interest which has continued to accrue.

**COUNT ONE**:
(18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

4.      The allegations in paragraphs 1 through 3 are realleged and incorporated as if fully set forth herein.

5.      At times relevant to this Indictment, Co-Conspirator #1 (CC-1) was an individual residing in Andover, Massachusetts.  CC-1 worked as an attorney.

6.      At times relevant to this Indictment, Co-Conspirator #2 (CC-2) was an individual residing in Andover, Massachusetts.  CC-2 worked as a real estate agent.

7.      At times relevant to this Indictment, Nationstar Mortgage Holdings Inc. (Nationstar) was based in Dallas, Texas and provided mortgage loan servicing, origination and transaction-based services related principally to single-family residences throughout the United States.

<u>321 Nahant Road, Nahant, Massachusetts</u>

8.      The real property located at 321 Nahant Road, Nahant, Massachusetts (321 Nahant) was purchased in AVEDISIAN's name for $970,000 in or around September 2004; at the same time, a mortgage in the amount of $776,000 was recorded against 321 Nahant.  The nominal borrower was AVEDISIAN.

9.      In or around December 2005, the defendants refinanced the mortgage on 321 Nahant, and a new mortgage in the amount of $949,000 was secured by 321 Nahant.  Nationstar began servicing the mortgage on 321 Nahant in or around August 2011.  In or around December 2012, the mortgage was assigned to the Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the Holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FHAMS 200 6-FA-1 (the Investor).  Nationstar continued to service the loan until in or

around December 2016, when title to the property was transferred from AVEDISIAN to

DECICCO, as set forth herein.

General Background on Real Estate Short Sales

10.     A "short sale" is a sale of real estate for less than the value of any mortgage debt

on the property.  Short sales are an alternative to foreclosure that typically occur only with the

consent of the mortgage lender (the short-selling bank), and that generally result in the short-

selling bank absorbing a loss on the loan and releasing the borrower from the unpaid balance of

the mortgage.

11.     By their very nature, short sales are intended to be arms-length transactions in

which the buyers and sellers are unrelated and act independently, and in which the sellers cede

their ownership and control of the subject properties in exchange for the short-selling bank's

agreement to release them from their unpaid mortgage debt.

The Conspiracy to Commit Wire Fraud (Short-Sale)

12.     In or about and between October 2015 and December 2016, in the District of

Massachusetts and elsewhere, the defendants,

**(1) GARY P. DECICCO, and**
**(2) PAMELA M. AVEDISIAN,**

together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly conspired

to commit wire fraud, in violation of Title 18, United States Code, Section 1343, to wit: having

devised and intending to devise any scheme and artifice to defraud and to obtain money and property

by means of materially false and fraudulent pretenses, representations and promises, for the purpose

of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and

sounds to be transmitted by means of wire communication in interstate commerce.

3

13.    The purpose and object of the conspiracy was for DECICCO, AVEDISIAN, CC-1, CC-2, and others known and unknown to the Grand Jury, to reduce the mortgage debt owed on 321 Nahant by engaging in a sham short-sale of the property from AVEDISIAN to DECICCO.

<u>Manner and Means of the Conspiracy</u>

Among the manner and means by which the coconspirators accomplished the objects of the conspiracy were the following:

14.    DECICCO and AVEDISIAN were romantically involved from at least as early as 1999 until at least as late as August 2016. DECICCO and AVEDISIAN had a daughter together in 1999, and they lived together with their daughter at 2 Nectar Place, Nahant, Massachusetts (2 Nectar) from at least as early as 2001 until at least as late as October 2016.

15.    DECICCO and AVEDISIAN have shared responsibility for numerous limited liability companies over the years, including VILI Realty LLC (from at least 2002 until at least 2009, AVEDISIAN was the manager, DECICCO was an authorized signatory, and both DECICCO and AVEDISIAN were authorized to execute real estate documents), LIVI Realty, LLC (from at least 2004 until at least 2009, DECICCO was the manager, AVEDISIAN was an authorized signatory, and DECICCO was authorized to execute real estate documents), PAGD Realty, LLC (from at least 2004 until at least 2015, DECICCO was the manager and both DECICCO and AVEDISIAN were authorized to execute real estate documents; from at least 2008 until at least 2009, AVEDISIAN was an authorized signatory), Atlantis Marina Docks, LLC (from at least 2012 until at least June 2016, DECICCO and AVEDISIAN were managers, and DECICCO was authorized to execute real estate documents), and 60 Salem Turnpike LLC (from at least 2012 until at least June 2017, DECICCO was the manager, AVEDISIAN was an

authorized signatory, and both DECICCO and AVEDISIAN were authorized to execute real estate documents).

16.   In September 2004, 321 Nahant was purchased in AVEDISIAN's name.

17.   Between in or around 2004 and on or around December 1, 2016, while 321 Nahant was titled in AVEDISIAN's name, DECICCO controlled 321 Nahant, funded the payments made towards the loans secured by 321 Nahant, and represented to multiple individuals that he owned 321 Nahant.

18.   DECICCO's ex-girlfriend (not AVEDISIAN) and her daughter with DECICCO lived in one unit at 321 Nahant between at least as early as 2009 and at least as late as March 2017. In addition, DECICCO personally rented out at least one other unit at 321 Nahant to a tenant in or around the summer of 2015, and personally collected rent for that unit until at least March 2017.

19.   In or around October 2015, AVEDISIAN and CC-1 sought permission from Nationstar to short-sell 321 Nahant for less than the value of the outstanding mortgage in exchange for a release from the unpaid mortgage debt. In or around November 2015, CC-1 introduced DECICCO to CC-2 for the purpose of listing 321 Nahant for sale.

20.   Beginning in or around October 2015, DECICCO, AVEDISIAN, CC-1, CC-2, and others known and unknown to the Grand Jury, made, or caused to be made, materially false and misleading statements in numerous documents submitted to Nationstar in connection with the short sale of 321 Nahant, including, but not limited to: false representations that AVEDISIAN was unable to meet her obligations under the loan, and certifications of arms-length transaction in which AVEDISIAN and DECICCO falsely represented that they were unrelated and unaffiliated by family, marriage, or commercial enterprise.

21.     On or about May 7, 2016, CC-2 prepared, and DECICCO and AVEDISIAN signed, an offer for DECICCO, using the name "GDC Construction" and the address "58 Pulaski St, Peabody, MA" to purchase 321 Nahant from AVEDISIAN, using the address 321 Nahant, for $610,000. At the time, both DECICCO and AVEDISIAN lived at 2 Nectar Place.

22.     On or about June 7, 2016, AVEDISIAN submitted a Hardship Affidavit to Nationstar requesting permission to proceed with a short sale of 321 Nahant. In the affidavit, AVEDISIAN stated falsely that she was unable to meet her obligations on the loan and was "forced to sell the property for less than the amount of the debt on the property." AVEDISIAN further stated that she had received an offer to purchase 321 Nahant, but she did not inform Nationstar that the offer was from DECICCO, that DECICCO was living with her at 2 Nectar Place, that she and DECICCO had a daughter together, or that she and DECICCO had multiple commercial relationships.

23.     On or about October 31, 2016, DECICCO and AVEDISIAN transferred $650,000 from a Bank of America account held in the name of the Atlantis Marina Docks, LLC (the Atlantis Account) to a Bank of America account held in the name of The Mills at Pulaski, LLC (The Mills Account) via a check payable to DECICCO with the memo "loan." On or about November 4, 2016, DECICCO and AVEDISIAN signed a revised offer for 321 Nahant, also in the amount of $610,000, listing DECICCO as the buyer, but with an address of "58 Pulaski Street, Peabody, MA 01960." AVEDISIAN's address was listed as 321 Nahant. At the time the offer was executed, DECICCO lived at 2 Nectar Place, and AVEDISIAN lived at 2 Nectar Place or in Ashland, Massachusetts with her sister.

24.     On or about November 10, 2016, after CC-2 informed DECICCO and CC-1 by text that he had submitted the short sale file to Nationstar and that he was "getting good

feedback, seeing if you're ready to close," DECICCO responded by text to CC-1 and CC-2,
"Good. Just concerned that they will find out about my relationship with Pam." CC-2
responded, "Way past that. Should be in the clear." DECICCO responded, "Great."

25.     On or about November 17, 2016, DECICCO, AVEDISIAN and CC-2 signed a
"Short Sale Affidavit," also referred to as an Arm's Length Affidavit, as required for the short
sale by Nationstar.  By signing the affidavit, which CC-2 submitted electronically to Nationstar,
DECICCO and AVEDISIAN falsely represented, under the pains and penalties of perjury, that
they were "unrelated and unaffiliated by family, marriage, or commercial purpose." They also
acknowledged in the affidavit that they understood that the loan servicer (*i.e.*, Nationstar) and the
Investor were relying on the representations made in the affidavit in consideration for the
reduction of the payoff amount of the mortgage and agreement to sell 321 Nahant.

26.     In or around November 2016, CC-1 arranged for another attorney at his firm
(Closing Attorney 1) to represent DECICCO for the short sale closing.  Shortly before the short
sale was scheduled to close in or around late November 2016, Closing Attorney 1 learned that
DECICCO and AVEDISIAN had been involved in the same limited liability company, and
DECICCO, AVEDISIAN, CC-1 and CC-2 were all made aware that Closing Attorney 1 would
not perform the closing unless the commercial relationship between DECICCO and
AVEDISIAN was disclosed to Nationstar.  A few days later, DECICCO retained another
attorney (Closing Attorney 2) to represent him for the short sale closing.  None of the
coconspirators informed Closing Attorney 2 that DECICCO and AVEDISIAN had a family or
commercial relationship.

27.     Nationstar approved the short sale of 321 Nahant from AVEDISIAN to
DECICCO for $610,000.  On or about November 30, 2016, DECICCO caused the purchase of a

cashier's check (the Cashier's Check), payable to himself, in the amount of $586,010 with funds from The Mills Account.

28. On or about December 1, 2016, DECICCO, AVEDISIAN and CC-2 executed a second Short Sale Affidavit, which Closing Attorney 2 subsequently submitted to Nationstar. In the Short Sale Affidavit, DECICCO, AVEDISIAN and CC-2 again falsely represented, under the pains and penalties of perjury, that DECICCO and AVEDISIAN were "unrelated and unaffiliated by family, marriage, or commercial purpose." Also on or about December 1, 2016, DECICCO signed the Cashier's Check over to Closing Attorney 2's law firm, and the Cashier's Check was deposited into Closing Attorney 2's IOLTA account.

29. On or about December 2, 2016, $571,850 was wire transferred from Closing Attorney 2's IOLTA account at Citizens Bank Massachusetts to an account held in the name of Nationstar at Wells Fargo Bank in California. After closing costs, Nationstar received approximately $571,850 towards the outstanding mortgage.

30. When it approved the sale, Nationstar was not aware of any personal or commercial relationship between DECICCO and AVEDISIAN. Nationstar would not have approved the short sale had it known there was a personal relationship between DECICCO and AVEDISIAN, nor would it have approved the short sale had it known there was a commercial relationship between DECICCO and AVEDISIAN.

31. The funds DECICCO used to purchase 321 Nahant on December 1, 2016 came from the Atlantis Account. The funds were proceeds of a purported sale of the Atlantis Marina in Winthrop, Massachusetts from AVEDISIAN to DECICCO in September 2016. AVEDISIAN subsequently "loaned" DECICCO the $610,000 he used to purchase 321 Nahant. Nationstar

would not have approved the short sale had it known about the financial transaction that constituted the source of the $610,000 that DECICCO used to purchase 321 Nahant.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (18 U.S.C. § 1343 – Wire Fraud)

32.     The allegations in paragraphs 1 through 3, 5 through 11, and 13 through 31 are realleged and incorporated as if fully set forth herein.

33.     On or about December 2, 2016, within the District of Massachusetts and elsewhere, the defendants,

### (1) GARY P. DECICCO, and
### (2) PAMELA M. AVEDISIAN,

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, to wit:  a $571,850 wire transfer from the account of Closing Attorney 2 at Citizens Bank Massachusetts to Wells Fargo Bank account number xxxxxxxxxxxxx9450 in California.

All in violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (18 U.S.C. § 1349 – Conspiracy To Commit Bank Fraud)

34.     The allegations in paragraphs 1 through 3 are realleged and incorporated as if fully set forth herein.

35.     At times relevant to this Indictment, Co-Conspirator #3 (CC-3) was an individual residing in Winthrop, Massachusetts.

36.     At times relevant to this Indictment, Eastern Bank was a "financial institution" as that term is defined in Title 18, United States Code, Section 20.

37.     At times relevant to this Indictment, Broker #1 (Broker 1) was a commercial mortgage broker whose office was located in Newton, Massachusetts.

### 58 Pulaski

38.     In or around 2004, the real property located at 58 Pulaski Street, Peabody, Massachusetts (58 Pulaski) was purchased by 58 Pulaski LLC, in which AVEDISIAN reported to the IRS a 33% interest. AVEDISIAN's reported interest in 58 Pulaski LLC increased to 56% by 2011. By January 2012, both AVEDISIAN and DECICCO were identified as members of 58 Pulaski LLC. In or around January 2012, 58 Pulaski LLC sold the 58 Pulaski property to The Mills at Pulaski, LLC; the sole member of The Mills at Pulaski, LLC was Pulaski Member, LLC. DECICCO and another individual (Investor 1) each held a 50% interest in Pulaski Member, LLC.

39.     In June 2014, CC-3 provided $900,000 to DECICCO for investment in The Mills at Pulaski, LLC. DECICCO used a portion of those funds to purchase Investor 1's share in Pulaski Member, LLC. Investor 1 maintained two mortgages on 58 Pulaski.

<u>The Conspiracy to Commit Bank Fraud (Pulaski Loan)</u>

40.    In or about and between October 2015 and September 2016, in the District of
Massachusetts and elsewhere, the defendant,

## (1) GARY P. DECICCO

together with CC-3 and others known and unknown to the Grand Jury, knowingly conspired to

commit bank fraud, in violation of Title 18, United States Code, Section 1344, to wit: to execute

and attempt to execute a scheme and artifice to defraud and to obtain moneys, funds, credits,

assets, securities, and other property owned by and under the custody and control of a financial

institution by means of materially false and fraudulent pretenses, representations and promises,

in connection with a mortgage secured by the commercial real estate located at 58 Pulaski Street,

Peabody, Massachusetts.

41.    The purpose and object of the conspiracy was for DECICCO and CC-3 to obtain a

mortgage loan secured by 58 Pulaski by falsely stating, among other things, that the rental

income from 58 Pulaski was approximately thirty percent higher than the actual rental income.

<u>Manner and Means of the Conspiracy</u>

Among the manner and means by which the coconspirators accomplished the objects of

the conspiracy were the following:

42.    In or around October or November 2015, DECICCO began to seek financing for

The Mills at Pulaski, LLC, in order to pay off Investor 1's mortgage loans.  When it became

clear that DECICCO's background, including his criminal fraud conviction and tax liens, would

be an impediment to financing, DECICCO introduced CC-3 as his partner in The Mills at

Pulaski, LLC, and they agreed that CC-3 would be the guarantor on any loan.  When it then

became clear that, even with CC-3 as the guarantor, DECICCO's continued involvement in The

Mills at Pulaski, LLC was an impediment to financing, DECICCO and CC-3 purportedly agreed that DECICCO would sell his entire interest in The Mills at Pulaski, LLC to CC-3.

43.     On or about November 28, 2015, DECICCO retained Broker 1 to provide consulting and mortgage banking services on an exclusive basis with respect to securing permanent mortgage financing for 58 Pulaski.

44.     In or around and between November 2015 and September 2016, DECICCO and CC-3 falsified the rent rolls for 58 Pulaski and prepared fake leases to support the false rent rolls, all for submission to banks in support of their loan request.  Some of the fake leases were entirely false, in that no such tenant existed for 58 Pulaski.  Other leases falsely inflated the amount of the monthly rent for actual tenants.

45.     One of the fake leases was for a moving company which never leased space at 58 Pulaski.  In or around November or December 2015, in order to deceive bank personnel and appraisers in connection with their financing requests, DECICCO and CC-3 stenciled the name of the moving company on the door to a unit at 58 Pulaski.

46.     In or around and between November 2015 and September 2016, DECICCO and CC-3 provided falsified rent rolls and leases for 58 Pulaski to Broker 1 for submission to banks in support of the financing request for The Mills at Pulaski, LLC.  Neither DECICCO nor CC-3 told Broker 1 that the rent roll was falsely inflated or that some of the leases were fake.

47.     In and around and between February 2016 and September 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted leases for 58 Pulaski – some of which had been falsified by DECICCO and CC-3 without Broker 1's knowledge – to Bank of New England and Leader Bank in support of DECICCO's and CC-3's financing requests.

13

48.     In or around March 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Leader Bank, which falsely represented that the monthly rental income for 58 Pulaski was $94,262, when in fact it was no more than $74,997.

49.     On or about April 21, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Bank of New England, which falsely represented that the monthly rental income for 58 Pulaski was $106,097, when in fact it was no more than $74,997.

50.     On or about June 14, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Eastern Bank which falsely represented that the monthly rental income for 58 Pulaski was $108,897, when in fact it was no more than $74,997.

51.     On or about July 11, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a "Source & Use of Funds" to Eastern Bank, detailing the source of funds for CC-3's purported $7.8 million purchase of The Mills at Pulaski, LLC from DECICCO, as well as the proposed disposition of a $5.5 million loan. The "Source & Use of Funds" did not state that mortgage funds would be used to repay CC-3's $900,000 investment in The Mills at Pulaski, LLC.

52.     In or around September 2016, Eastern Bank agreed to loan $5.5 million to The Mills at Pulaski, LLC, secured by 58 Pulaski. Eastern Bank's approval was based, in part, on the false representations by and on behalf of DECICCO and CC-3 that the yearly rental income for 58 Pulaski was approximately $1.3 million, and that CC-3 would maintain a cash equity stake in The Mills at Pulaski, LLC based on his 2014 investment.

53.     On or about September 16, 2016, DECICCO executed closing documents, including a HUD-1 Settlement Statement, for the purchase and sale of The Mills at Pulaski, LLC, which omitted the fact that mortgage funds would be paid to CC-3 after the closing.

54.     On or about September 20, 2016, approximately $3,439,214 in proceeds from the Eastern Bank loan was wire transferred into a Bank of America account held in the name of the Atlantis Marina Docks, LLC (the Atlantis Account).   On or about September 22, 2016, AVEDISIAN signed a check drawn on the Atlantis Account and made payable to DECICCO's attorney, in the amount of $1,206,000, with the memo line "for [CC-3]."   The check was for repayment of CC-3's initial $900,000 investment in The Mills at Pulaski, LLC, plus interest accrued thereon.   This payment was not disclosed to Eastern Bank.

All in violation of Title 18, United States Code, Section 1349.

## COUNT FOUR
(18 U.S.C. § 1344 – Bank Fraud)

55.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 3,

35 through 39, and 41 through 54 of this Indictment and further charges that:

56.     In or about and between October 2015 and September 2016, in the District of

Massachusetts and elsewhere, the defendant,

### (1) GARY P. DECICCO,

knowingly executed and attempted to execute a scheme and artifice to defraud and to obtain

moneys, funds, credits, assets, securities, and other property owned by and under the custody and

control of a financial institution, to wit: Eastern Bank, by means of materially false and

fraudulent pretenses, representations and promises, in connection with a mortgage secured by

real property located at 58 Pulaski Street, Peabody, Massachusetts.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNTS FIVE THROUGH EIGHT
(18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1349 – Attempted Wire Fraud)

57.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 3 of this Indictment and further charges that:

### Scheme to Defraud

58.     In and around and between February 2016 and December 2016, DECICCO devised and intended to devise a scheme and artifice to defraud and to obtain money and property by preparing and submitting and directing others to prepare and submit false invoices to insurance companies, in support of DECICCO's claims for financial reimbursement from those insurance companies.

59.     In or around February 2016, DECICCO contacted Insurance Company #1 (Insurer 1) to report that a 1981 Down East lobster boat belonging to one of their insured had sunk at a dock located at the Atlantis Marina in Winthrop, Massachusetts in December 2015.  DECICCO paid an individual $1,500 in cash to raise the boat, and he paid another individual $100 in cash to haul the boat out of the water.  DECICCO then submitted a fake invoice to Insurer 1, in the amount of $32,000, purportedly for the removal of the sunken boat.  The fake invoice stated, among other things, that the removal required "2 crews . . . 5 men . . . [and] 4 oil booms," and that it cost $4,000 to "Remove From Marina via trailer."  Based on the false representations DECICCO made and the fake invoice he provided to Insurer 1, Insurer 1 paid DECICCO $32,000 for the removal of the boat.

60.     In or around August 2016, DECICCO contacted Insurance Company #2 (Insurer 2) to report damage to a 2006 Maserati (the Maserati) titled in AVEDISIAN's name.  DECICCO had purchased the Maserati in or around November 2015 for $14,000, but subsequently arranged

for the filing of a Massachusetts Department of Transportation RMV-1 Application Form (the

RMV-1) which falsely stated that AVEDISIAN purchased the Maserati from a Revere auto body

shop (the Auto Body Shop) for $25,000 in March 2016. Insurer 2 ultimately determined that the

Maserati should be totaled; based in part on the false RMV-1, Insurer 2 offered to pay $20,553

for the totaled Maserati. DECICCO disputed the offer, and in or around October 2016,

DECICCO emailed two fake invoices from the Auto Body Shop, falsely reflecting the

installation of a clutch ($17,180) and four wheels ($4,350) on the Maserati, to a Senior Claims

Representative for Insurer 2. Based in part on the fake invoices, Insurer 2 agreed to give

DECICCO and AVEDISIAN credit for the wheels, and in or around March 2017, paid

$24,437.50 to AVEDISIAN for the totaled Maserati.

61.    In or around November 2016, DECICCO and CC-3 asked a tenant of 58 Pulaski

(Tenant 1) to report to Insurance Company #3 (Insurer 3) that a 1992 Blackfin boat belonging to

CC-3 sunk at a dock located at the Atlantis Marina. CC-3 did not have insurance coverage for

the boat, which DECICCO had given to CC-3 as payment for CC-3's share of the net profits

from 58 Pulaski. DECICCO, CC-3 and Tenant 1 (at the direction of DECICCO and CC-3) all

falsely told Insurer 3 that Tenant 1 was responsible for the boat when it sank. Insurer 3 agreed to

advance the cost of raising the boat, contingent on receipt of a reasonable estimate and proof of

insurance coverage for the marine salvage company. On or about November 21, 2017, an

individual acting at DECICCO's direction submitted to Insurer 3 an estimate, in the amount of

$15,890, for the cost of raising the boat. Insurer 3 refused payment because it never received

proof of insurance for the salvaging operation. In or around December 2016, DECICCO paid an

individual $2,000 in cash to raise the boat, and Tenant 1 hauled the boat out of the water for no

change. On or about December 8, 2016, DECICCO falsely told Insurer 3 that the United States

Coast Guard had required DECICCO to raise the boat, and DECICCO requested reimbursement for the cost. DECICCO then arranged for the preparation of a false invoice for raising and hauling the boat, in the amount of $16,250.

62.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

## (1) GARY P. DECICCO,

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce, as follows:

| COUNT | APPROXIMATE WIRE DATE | WIRE TRANSMISSION |
|-------|-----------------------|-------------------|
| 5 | 2/16/2016 | $10,000 from an account held in the name of Insurer 1 at Citizens Bank in Rhode Island to Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 6 | 2/22/2016 | $22,000 from an account held in the name of Insurer 1 at Citizens Bank to Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 7 | 10/10/2016 | Email sent by DECICCO to Senior Claims Representative for Insurer 2, attaching fake invoices |

All in violation of Title 18, United States Code, Section 1343.

63.     On or about the date set forth below, in the District of Massachusetts and elsewhere, the defendant,

**(1) GARY P. DECICCO,**

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud and attempting to do so, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, and attempting to do so in violation of 18 U.S.C. § 1343, as follows:

| COUNT | APPROXIMATE WIRE DATE | WIRE TRANSMISSION |
|-------|-----------------------|-------------------|
| 8 | 11/22/2016 | Email sent by DECICCO to M.M. regarding estimate for work relating to salvage of 1992 Blackfin boat |

All in violation of Title 18, United States Code, Section 1349.

## COUNTS NINE THROUGH FOURTEEN
### (18 U.S.C. § 1957 – Unlawful Monetary Transactions)

64.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 3,

35 through 39, and 41 through 54 of this Indictment and further charges that:

65.     On or about the dates set forth below, in the District of Massachusetts and

elsewhere, the defendant,

### (1)  GARY P. DECICCO,

knowingly engaged and attempted to engage in the following monetary transactions by, through,

and to a financial institution affecting interstate commerce, that is, Bank of America, the deposits

of which are insured by the Federal Deposit Insurance Corporation, in criminally derived

property of a value greater than $10,000, which monetary transactions involved the proceeds of

specified unlawful activity, that is, bank fraud, in violation of 18 U.S.C. § 1344:

| COUNT | AMOUNT | APPROXIMATE DATE | TRANSACTION |
|---|---|---|---|
| 9 | $1,206,000 | 9/22/2016 | Deposit of Bank of America check number 1117, made payable to Jeff Turco, Esq., drawn on Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC, into Leader Bank account number xxxxxx2913, held in the name of Law Office of Jeffrey R. Turco |

| 10 | $360,000 | 11/17/2016 | Purchase of Bank of America Cashier's Check No. 1456504938, payable to Harmon Law Office P.C., with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 11 | $586,010 | 11/30/2016 | Purchase of Bank of America Cashier's Check No. 1456504981, payable to GARY P. DECICCO, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 12 | $118,775 | 12/15/2016 | Purchase of Bank of America Cashier's Check No. 1456505043, payable to IAA, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 13 | $40,000 | 12/19/2016 | Purchase of Bank of America Cashier's Check No. 1456505056, payable to Godson Legal Group, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 14 | $360,000 | 1/13/2017 | Purchase of Bank of America Cashier's Check No. 1456505149, payable to Godson Legal Group, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FIRST WIRE FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.      Upon conviction of any offense alleged in Counts One or Two of this Indictment,

### (1) GARY P. DECICCO, and
### (2) PAMELA M. AVEDISIAN,

defendants herein, shall forfeit to the United States of America, pursuant to Title 18, United

States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any

property, real or personal, which constitutes or is derived from proceeds traceable to such

offense. Such property includes, without limitation:

      a.     the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1.

2.      If any of the property described in Paragraph 1 above as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act and omission of the defendants –

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with a third party;

      c.     has been placed beyond the jurisdiction of this Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 1 above,

including but not limited to:

a.    Unit 1704 THE LANDMARK, a Condominium, according to the
      Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of
      the Public Records of Miami-Dade County, Florida;

b.    550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a
      deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page
      9;

c.    A certain parcel of land known as Lot C on a plan of land by Joseph
      Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192,
      situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk
      County Registry of Deeds, Book 46794, Page 15;

d.    all right, title and interest in the Atlantis Marina Docks, LLC;

e.    one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number
      ZFF67NFA2A0175517.200 units of Meadowbrook Farm, L.L.C., as
      described in Stock Certificate 31, dated January 7, 2006;

f.    the real property and buildings located at 119 Rear Foster Street, Peabody,
      Massachusetts, having a deed recorded at the Southern Essex County
      Registry of Deeds, Book 35499, Page 318;

g.    the real property and buildings located at 60 Salem Turnpike, Saugus,
      Massachusetts, having a deed recorded at the Southern Essex County
      Registry of Deeds, Book 30154, Page 347; and

h.    the real property and buildings located at 7 and 29 Thayer Avenue,
      Revere, Massachusetts, having a deed recorded at the Southern Essex
      County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## BANK FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.      Upon conviction of any offense alleged in Counts Three or Four of this Indictment,

## (1) GARY P. DECICCO,

defendant herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.  Such property includes, without limitation, the following:

      a.    the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1;

      a.    Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida;

      b.    550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

      c.    A certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

      d.    all right, title and interest in the Atlantis Marina Docks, LLC; and

      e.    one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517.

2.      If any of the property described in Paragraph 1 above as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2)(A), as a result of any act and omission of the defendant –

      a.    cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with a third party;

c.   has been placed beyond the jurisdiction of this Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 1 above,

including but not limited to:

a.   200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

b.   the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

c.   the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

d.   the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## SECOND WIRE FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.     Upon conviction of any offense alleged in Counts Five through Eight of this Indictment,

### (1) GARY P. DECICCO,

defendant herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

2.     If any of the property described in Paragraph 1 above as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act and omission of the defendant --

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with a third party;

     c.    has been placed beyond the jurisdiction of this Court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above, including but not limited to:

     a.    the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1;

b.   Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida;

c.   550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

d.   A certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

e.   all right, title and interest in the Atlantis Marina Docks, LLC;

f.   one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517;

g.   200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

h.   the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

i.   the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

j.   the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## MONEY LAUNDERING FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.      Upon conviction of one or more of the offenses in violation of 18 U.S.C. § 1957

charged in Counts Nine through Fourteen of this Indictment,

### (1) GARY P. DECICCO,

the defendant herein, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), any

property, real or personal, involved in such offenses, or any property traceable to such property,

including but not limited to:

  a. the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1;

  b. Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida; and

  c. one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517.

2.      If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act and omission of

the defendant --

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with a third party;

  c. has been placed beyond the jurisdiction of this Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 1 above,

including but not limited to:

a. 550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

b. a certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

c. all right, title and interest in the Atlantis Marina Docks, LLC;

d. 200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

e. the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

f. the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

g. the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
KRISTINA E. BARCLAY
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS, _____, 2018

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

1-11-18

12:48 pm