UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-CR-10013-RGS |
| | ) | |
| (1) GARY P. DECICCO, and | ) | 18 U.S.C. § 1349 (Fraud Conspiracy and Attempt); |
| (2) PAMELA M. AVEDISIAN, | ) | 18 U.S.C. § 1343 (Wire Fraud); |
| | ) | 18 U.S.C. § 1344 (Bank Fraud); |
| Defendants | ) | 18 U.S.C. § 1957 (Unlawful Monetary Transactions); |
| | ) | 18 U.S.C. § 371 (Conspiracy) |
| | ) | 26 U.S.C. § 7201 (Tax Evasion) |
| | ) | 18 U.S.C. § 2 (Aiding and Abetting) |
| | ) | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), (a)(2)(A) and |
| | ) | 28 U.S.C. § 2461(c) (Criminal Forfeiture) |

## FIRST SUPERSEDING INDICTMENT

The Grand Jury charges that:

### General Allegations

1.  At times relevant to this First Superseding Indictment, the defendant, GARY P. DECICCO, was a resident of Nahant, Massachusetts.

2.  At times relevant to this First Superseding Indictment, the defendant, PAMELA M. AVEDISIAN, was a resident of Nahant or Ashland, Massachusetts.

3.  At times relevant to this First Superseding Indictment, the Internal Revenue Service (the IRS) was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.

4.  In or around September 2013, DECICCO agreed with the IRS that his outstanding federal tax obligation for the tax years 2008, 2009, 2010 and 2011 was approximately $342,000. As of September 2016, DECICCO owed approximately $340,000 to the IRS, which sum included interest which has continued to accrue.

## COUNT ONE:
### (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

5.      The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4 of this First Superseding Indictment.

6.      At times relevant to this First Superseding Indictment, Co-Conspirator #1 (CC-1) was an individual residing in Andover, Massachusetts. CC-1 worked as an attorney.

7.      At times relevant to this First Superseding Indictment, Co-Conspirator #2 (CC-2) was an individual residing in Andover, Massachusetts. CC-2 worked as a real estate agent.

8.      At times relevant to this First Superseding Indictment, Nationstar Mortgage Holdings Inc. (Nationstar) was based in Dallas, Texas and provided mortgage loan servicing, origination and transaction-based services related principally to single-family residences throughout the United States.

### 321 Nahant Road, Nahant, Massachusetts

9.      The real property located at 321 Nahant Road, Nahant, Massachusetts (321 Nahant) was purchased in AVEDISIAN's name for $970,000 in or around September 2004; at the same time, a mortgage in the amount of $776,000 was recorded against 321 Nahant. The nominal borrower was AVEDISIAN.

10.      In or around December 2005, the defendants refinanced the mortgage on 321 Nahant, and a new mortgage in the amount of $949,000 was secured by 321 Nahant. Nationstar began servicing the mortgage on 321 Nahant in or around August 2011. In or around December 2012, the mortgage was assigned to the Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the Holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FHAMS 200 6-FA-1 (the Investor). Nationstar continued to service the loan until in or

around December 2016, when title to the property was transferred from AVEDISIAN to DECICCO, as set forth herein.

General Background on Real Estate Short Sales

11.    A "short sale" is a sale of real estate for less than the value of any mortgage debt on the property. Short sales are an alternative to foreclosure that typically occur only with the consent of the mortgage lender (the short-selling bank), and that generally result in the short-selling bank absorbing a loss on the loan and releasing the borrower from the unpaid balance of the mortgage.

12.    By their very nature, short sales are intended to be arms-length transactions in which the buyers and sellers are unrelated and act independently, and in which the sellers cede their ownership and control of the subject properties in exchange for the short-selling bank's agreement to release them from their unpaid mortgage debt.

The Conspiracy to Commit Wire Fraud (Short-Sale)

13.    In or about and between October 2015 and December 2016, in the District of Massachusetts and elsewhere, the defendants,

<strong>(1) GARY P. DECICCO, and<br/>(2) PAMELA M. AVEDISIAN,</strong>

together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343, to wit: having devised and intending to devise any scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce.

14. The purpose and object of the conspiracy was for DECICCO, AVEDISIAN, CC-1, CC-2, and others known and unknown to the Grand Jury, to reduce the mortgage debt owed on 321 Nahant by engaging in a sham short-sale of the property from AVEDISIAN to DECICCO.

<u>Manner and Means of the Conspiracy</u>

Among the manner and means by which the coconspirators accomplished the objects of the conspiracy were the following:

15. DECICCO and AVEDISIAN were romantically involved from at least as early as 1999 until at least as late as August 2016. DECICCO and AVEDISIAN had a daughter together in 1999, and they lived together with their daughter at 2 Nectar Place, Nahant, Massachusetts (2 Nectar) from at least as early as 2001 until at least as late as October 2016.

16. DECICCO and AVEDISIAN have shared responsibility for numerous limited liability companies over the years, including VILI Realty LLC (from at least 2002 until at least 2009, AVEDISIAN was the manager, DECICCO was an authorized signatory, and both DECICCO and AVEDISIAN were authorized to execute real estate documents), LIVI Realty, LLC (from at least 2004 until at least 2009, DECICCO was the manager, AVEDISIAN was an authorized signatory, and DECICCO was authorized to execute real estate documents), PAGD Realty, LLC (from at least 2004 until at least 2015, DECICCO was the manager and both DECICCO and AVEDISIAN were authorized to execute real estate documents; from at least 2008 until at least 2009, AVEDISIAN was an authorized signatory), Atlantis Marina Docks, LLC (from at least 2012 until at least June 2016, DECICCO and AVEDISIAN were managers, and DECICCO was authorized to execute real estate documents), and 60 Salem Turnpike LLC (from at least 2012 until at least June 2017, DECICCO was the manager, AVEDISIAN was an

4

authorized signatory, and both DECICCO and AVEDISIAN were authorized to execute real estate documents).

17.     In September 2004, 321 Nahant was purchased in AVEDISIAN's name.

18.     Between in or around 2004 and on or around December 1, 2016, while 321 Nahant was titled in AVEDISIAN's name, DECICCO controlled 321 Nahant, funded the payments made towards the loans secured by 321 Nahant, and represented to multiple individuals that he owned 321 Nahant.

19.     DECICCO's ex-girlfriend (not AVEDISIAN) and her daughter with DECICCO lived in one unit at 321 Nahant between at least as early as 2009 and at least as late as March 2017. In addition, DECICCO personally rented out at least one other unit at 321 Nahant to a tenant in or around the summer of 2015, and personally collected rent for that unit until at least March 2017.

20.     In or around October 2015, AVEDISIAN and CC-1 sought permission from Nationstar to short-sell 321 Nahant for less than the value of the outstanding mortgage in exchange for a release from the unpaid mortgage debt. In or around November 2015, CC-1 introduced DECICCO to CC-2 for the purpose of listing 321 Nahant for sale.

21.     Beginning in or around October 2015, DECICCO, AVEDISIAN, CC-1, CC-2, and others known and unknown to the Grand Jury, made, or caused to be made, materially false and misleading statements in numerous documents submitted to Nationstar in connection with the short sale of 321 Nahant, including, but not limited to: false representations that AVEDISIAN was unable to meet her obligations under the loan, and certifications of arms-length transaction in which AVEDISIAN and DECICCO falsely represented that they were unrelated and unaffiliated by family, marriage, or commercial enterprise.

22. On or about May 7, 2016, CC-2 prepared, and DECICCO and AVEDISIAN signed, an offer for DECICCO, using the name "GDC Construction" and the address "58 Pulaski St, Peabody, MA" to purchase 321 Nahant from AVEDISIAN, using the address 321 Nahant, for $610,000. At the time, both DECICCO and AVEDISIAN lived at 2 Nectar Place.

23. On or about June 7, 2016, AVEDISIAN submitted a Hardship Affidavit to Nationstar requesting permission to proceed with a short sale of 321 Nahant. In the affidavit, AVEDISIAN stated falsely that she was unable to meet her obligations on the loan and was "forced to sell the property for less than the amount of the debt on the property." AVEDISIAN further stated that she had received an offer to purchase 321 Nahant, but she did not inform Nationstar that the offer was from DECICCO, that DECICCO was living with her at 2 Nectar Place, that she and DECICCO had a daughter together, or that she and DECICCO had multiple commercial relationships.

24. On or about October 31, 2016, DECICCO and AVEDISIAN transferred $650,000 from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC (the Atlantis 5259 account) to Bank of America account number xxxxxxxx9378 held in the name of The Mills at Pulaski, LLC (The Mills 9378 account) via a check payable to DECICCO with the memo "loan." On or about November 4, 2016, DECICCO and AVEDISIAN signed a revised offer for 321 Nahant, also in the amount of $610,000, listing DECICCO as the buyer, but with an address of "58 Pulaski Street, Peabody, MA 01960." AVEDISIAN's address was listed as 321 Nahant. At the time the offer was executed, DECICCO lived at 2 Nectar Place, and AVEDISIAN lived at 2 Nectar Place or in Ashland, Massachusetts with her sister.

25.     On or about November 10, 2016, after CC-2 informed DECICCO and CC-1 by text that he had submitted the short sale file to Nationstar and that he was "getting good feedback, seeing if you're ready to close," DECICCO responded by text to CC-1and CC-2, "Good. Just concerned that they will find out about my relationship with Pam." CC-2 responded, "Way past that. Should be in the clear." DECICCO responded, "Great."

26.     On or about November 17, 2016, DECICCO, AVEDISIAN and CC-2 signed a "Short Sale Affidavit," also referred to as an Arm's Length Affidavit, as required for the short sale by Nationstar. By signing the affidavit, which CC-2 submitted electronically to Nationstar, DECICCO and AVEDISIAN falsely represented, under the pains and penalties of perjury, that they were "unrelated and unaffiliated by family, marriage, or commercial purpose." They also acknowledged in the affidavit that they understood that the loan servicer (*i.e.*, Nationstar) and the Investor were relying on the representations made in the affidavit in consideration for the reduction of the payoff amount of the mortgage and agreement to sell 321 Nahant.

27.     In or around November 2016, CC-1 arranged for another attorney at his firm (Closing Attorney 1) to represent DECICCO for the short sale closing. Shortly before the short sale was scheduled to close in or around late November 2016, Closing Attorney 1 learned that DECICCO and AVEDISIAN had been involved in the same limited liability company, and DECICCO, AVEDISIAN, CC-1 and CC-2 were all made aware that Closing Attorney 1 would not perform the closing unless the commercial relationship between DECICCO and AVEDISIAN was disclosed to Nationstar. A few days later, DECICCO retained another attorney (Closing Attorney 2) to represent him for the short sale closing. None of the coconspirators informed Closing Attorney 2 that DECICCO and AVEDISIAN had a family or commercial relationship.

7

28.     Nationstar approved the short sale of 321 Nahant from AVEDISIAN to DECICCO for $610,000. On or about November 30, 2016, DECICCO caused the purchase of a cashier's check (the Cashier's Check), payable to himself, in the amount of $586,010 with funds from The Mills 9378 Account.

29.     On or about December 1, 2016, DECICCO, AVEDISIAN and CC-2 executed a second Short Sale Affidavit, which Closing Attorney 2 subsequently submitted to Nationstar. In the Short Sale Affidavit, DECICCO, AVEDISIAN and CC-2 again falsely represented, under the pains and penalties of perjury, that DECICCO and AVEDISIAN were "unrelated and unaffiliated by family, marriage, or commercial purpose." Also on or about December 1, 2016, DECICCO signed the Cashier's Check over to Closing Attorney 2's law firm, and the Cashier's Check was deposited into Closing Attorney 2's IOLTA account.

30.     On or about December 2, 2016, $571,850 was wire transferred from Closing Attorney 2's IOLTA account at Citizens Bank Massachusetts to an account held in the name of Nationstar at Wells Fargo Bank in California. After closing costs, Nationstar received approximately $571,850 towards the outstanding mortgage.

31.     When it approved the sale, Nationstar was not aware of any personal or commercial relationship between DECICCO and AVEDISIAN. Nationstar would not have approved the short sale had it known there was a personal relationship between DECICCO and AVEDISIAN, nor would it have approved the short sale had it known there was a commercial relationship between DECICCO and AVEDISIAN.

32.     The funds DECICCO used to purchase 321 Nahant on December 1, 2016 came from the Atlantis 5259 account. The funds were proceeds of a purported sale of the Atlantis Marina in Winthrop, Massachusetts from AVEDISIAN to DECICCO in September 2016.

AVEDISIAN subsequently "loaned" DECICCO the $610,000 he used to purchase 321 Nahant. Nationstar would not have approved the short sale had it known about the financial transaction that constituted the source of the $610,000 that DECICCO used to purchase 321 Nahant.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
(18 U.S.C. § 1343 – Wire Fraud)

33.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4, 6 through 12, and 14 through 32 of this First Superseding Indictment.

34.     On or about December 2, 2016, within the District of Massachusetts and elsewhere, the defendants,

**(1) GARY P. DECICCO, and**
**(2) PAMELA M. AVEDISIAN,**

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, to wit:  a $571,850 wire transfer from the account of Closing Attorney 2 at Citizens Bank Massachusetts to Wells Fargo Bank account number xxxxxxxxxxxxx9450 in California.

All in violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (18 U.S.C. § 1349 – Conspiracy To Commit Bank Fraud)

35.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4 and 24 of this First Superseding Indictment.

36.     At times relevant to this Indictment, Co-Conspirator #3 (CC-3) was an individual residing in Winthrop, Massachusetts.

37.     At times relevant to this Indictment, Eastern Bank was a "financial institution" as that term is defined in Title 18, United States Code, Section 20.

38.     At times relevant to this Indictment, Broker #1 (Broker 1) was a commercial mortgage broker whose office was located in Newton, Massachusetts.

### 58 Pulaski

39.     In or around 2004, the real property located at 58 Pulaski Street, Peabody, Massachusetts (58 Pulaski) was purchased by 58 Pulaski LLC, in which AVEDISIAN reported to the IRS a 33% interest. AVEDISIAN's reported interest in 58 Pulaski LLC increased to 56% by 2011. By January 2012, both AVEDISIAN and DECICCO were identified as members of 58 Pulaski LLC. In or around January 2012, 58 Pulaski LLC sold the 58 Pulaski property to The Mills at Pulaski, LLC; the sole member of The Mills at Pulaski, LLC was Pulaski Member, LLC. DECICCO and another individual (Investor 1) each held a 50% interest in Pulaski Member, LLC.

40.     In June 2014, CC-3 provided $900,000 to DECICCO for investment in The Mills at Pulaski, LLC. DECICCO used a portion of those funds to purchase Investor 1's share in Pulaski Member, LLC. Investor 1 maintained two mortgages on 58 Pulaski.

## The Conspiracy to Commit Bank Fraud (Pulaski Loan)

41.    In or about and between October 2015 and September 2016, in the District of
Massachusetts and elsewhere, the defendant,

### (1) GARY P. DECICCO

together with CC-3 and others known and unknown to the Grand Jury, knowingly conspired to
commit bank fraud, in violation of Title 18, United States Code, Section 1344, to wit: to execute
and attempt to execute a scheme and artifice to defraud and to obtain moneys, funds, credits,
assets, securities, and other property owned by and under the custody and control of a financial
institution by means of materially false and fraudulent pretenses, representations and promises,
in connection with a mortgage secured by the commercial real estate located at 58 Pulaski Street,
Peabody, Massachusetts.

42.    The purpose and object of the conspiracy was for DECICCO and CC-3 to obtain a
mortgage loan secured by 58 Pulaski by falsely stating, among other things, that the rental
income from 58 Pulaski was approximately thirty percent higher than the actual rental income.

## Manner and Means of the Conspiracy

Among the manner and means by which the coconspirators accomplished the objects of
the conspiracy were the following:

43.    In or around October or November 2015, DECICCO began to seek financing for
The Mills at Pulaski, LLC, in order to pay off Investor 1's mortgage loans.  When it became
clear that DECICCO's background, including his criminal fraud conviction and tax liens, would
be an impediment to financing, DECICCO introduced CC-3 as his partner in The Mills at
Pulaski, LLC, and they agreed that CC-3 would be the guarantor on any loan.  When it then
became clear that, even with CC-3 as the guarantor, DECICCO's continued involvement in The

Mills at Pulaski, LLC was an impediment to financing, DECICCO and CC-3 purportedly agreed that DECICCO would sell his entire interest in The Mills at Pulaski, LLC to CC-3.

44.     On or about November 28, 2015, DECICCO retained Broker 1 to provide consulting and mortgage banking services on an exclusive basis with respect to securing permanent mortgage financing for 58 Pulaski.

45.     In or around and between November 2015 and September 2016, DECICCO and CC-3 falsified the rent rolls for 58 Pulaski and prepared fake leases to support the false rent rolls, all for submission to banks in support of their loan request. Some of the fake leases were entirely false, in that no such tenant existed for 58 Pulaski. Other leases falsely inflated the amount of the monthly rent for actual tenants.

46.     One of the fake leases was for a moving company which never leased space at 58 Pulaski. In or around November or December 2015, in order to deceive bank personnel and appraisers in connection with their financing requests, DECICCO and CC-3 stenciled the name of the moving company on the door to a unit at 58 Pulaski.

47.     In or around and between November 2015 and September 2016, DECICCO and CC-3 provided falsified rent rolls and leases for 58 Pulaski to Broker 1 for submission to banks in support of the financing request for The Mills at Pulaski, LLC. Neither DECICCO nor CC-3 told Broker 1 that the rent roll was falsely inflated or that some of the leases were fake.

48.     In and around and between February 2016 and September 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted leases for 58 Pulaski – some of which had been falsified by DECICCO and CC-3 without Broker 1's knowledge – to Bank of New England and Leader Bank in support of DECICCO's and CC-3's financing requests.

13

49.     In or around March 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Leader Bank, which falsely represented that the monthly rental income for 58 Pulaski was $94,262, when in fact it was no more than $74,997.

50.     On or about April 21, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Bank of New England, which falsely represented that the monthly rental income for 58 Pulaski was $106,097, when in fact it was no more than $74,997.

51.     On or about June 14, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a rent roll for 58 Pulaski to Eastern Bank which falsely represented that the monthly rental income for 58 Pulaski was $108,897, when in fact it was no more than $74,997.

52.     On or about July 11, 2016, Broker 1, working on behalf of DECICCO and CC-3, submitted a "Source & Use of Funds" to Eastern Bank, detailing the source of funds for CC-3's purported $7.8 million purchase of The Mills at Pulaski, LLC from DECICCO, as well as the proposed disposition of a $5.5 million loan. The "Source & Use of Funds" did not state that mortgage funds would be used to repay CC-3's $900,000 investment in The Mills at Pulaski, LLC.

53.     In or around September 2016, Eastern Bank agreed to loan $5.5 million to The Mills at Pulaski, LLC, secured by 58 Pulaski. Eastern Bank's approval was based, in part, on the false representations by and on behalf of DECICCO and CC-3 that the yearly rental income for 58 Pulaski was approximately $1.3 million, and that CC-3 would maintain a cash equity stake in The Mills at Pulaski, LLC based on his 2014 investment.

54.     On or about September 16, 2016, DECICCO executed closing documents, including a HUD-1 Settlement Statement, for the purchase and sale of The Mills at Pulaski, LLC, which omitted the fact that mortgage funds would be paid to CC-3 after the closing.

14

55.     On or about September 20, 2016, approximately $3,439,214 in proceeds from the Eastern Bank loan was wire transferred into the Atlantis 5259 account. On or about September 22, 2016, AVEDISIAN signed a check drawn on the Atlantis 5259 account and made payable to DECICCO's attorney, in the amount of $1,206,000, with the memo line "for [CC-3]." The check was for repayment of CC-3's initial $900,000 investment in The Mills at Pulaski, LLC, plus interest accrued thereon. This payment was not disclosed to Eastern Bank.

All in violation of Title 18, United States Code, Section 1349.

## COUNT FOUR
(18 U.S.C. § 1344 – Bank Fraud)

56. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4, 36 through 40, and 42 through 55 of this First Superseding Indictment.

57. In or about and between October 2015 and September 2016, in the District of Massachusetts and elsewhere, the defendant,

### (1) GARY P. DECICCO,

knowingly executed and attempted to execute a scheme and artifice to defraud and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, to wit: Eastern Bank, by means of materially false and fraudulent pretenses, representations and promises, in connection with a mortgage secured by real property located at 58 Pulaski Street, Peabody, Massachusetts.

In violation of Title 18, United States Code, Sections 1344 and 2.

**COUNTS FIVE THROUGH EIGHT**
(18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1349 – Attempted Wire Fraud)

58.　　The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4 of this First Superseding Indictment.

### Scheme to Defraud

59.　　In and around and between February 2016 and December 2016, DECICCO devised and intended to devise a scheme and artifice to defraud and to obtain money and property by preparing and submitting and directing others to prepare and submit false invoices to insurance companies, in support of DECICCO's claims for financial reimbursement from those insurance companies.

60.　　In or around February 2016, DECICCO contacted Insurance Company #1 (Insurer 1) to report that a 1981 Down East lobster boat belonging to one of their insured had sunk at a dock located at the Atlantis Marina in Winthrop, Massachusetts in December 2015. DECICCO paid an individual $1,500 in cash to raise the boat, and he paid another individual $100 in cash to haul the boat out of the water. DECICCO then submitted a fake invoice to Insurer 1, in the amount of $32,000, purportedly for the removal of the sunken boat. The fake invoice stated, among other things, that the removal required "2 crews . . . 5 men . . . [and] 4 oil booms," and that it cost $4,000 to "Remove From Marina via trailer." Based on the false representations DECICCO made and the fake invoice he provided to Insurer 1, Insurer 1 paid DECICCO $32,000 for the removal of the boat.

61.　　In or around August 2016, DECICCO contacted Insurance Company #2 (Insurer 2) to report damage to a 2006 Maserati (the Maserati) titled in AVEDISIAN's name. DECICCO had purchased the Maserati in or around November 2015 for $14,000, but subsequently arranged

17

for the filing of a Massachusetts Department of Transportation RMV-1 Application Form (the RMV-1) which falsely stated that AVEDISIAN purchased the Maserati from a Revere auto body shop (the Auto Body Shop) for $25,000 in March 2016. Insurer 2 ultimately determined that the Maserati should be totaled; based in part on the false RMV-1, Insurer 2 offered to pay $20,553 for the totaled Maserati. DECICCO disputed the offer, and in or around October 2016, DECICCO emailed two fake invoices from the Auto Body Shop, falsely reflecting the installation of a clutch ($17,180) and four wheels ($4,350) on the Maserati, to a Senior Claims Representative for Insurer 2. Based in part on the fake invoices, Insurer 2 agreed to give DECICCO and AVEDISIAN credit for the wheels, and in or around March 2017, paid $24,437.50 to AVEDISIAN for the totaled Maserati.

62.     In or around November 2016, DECICCO and CC-3 asked a tenant of 58 Pulaski (Tenant 1) to report to Insurance Company #3 (Insurer 3) that a 1992 Blackfin boat belonging to CC-3 sunk at a dock located at the Atlantis Marina. CC-3 did not have insurance coverage for the boat, which DECICCO had given to CC-3 as payment for CC-3's share of the net profits from 58 Pulaski. DECICCO, CC-3 and Tenant 1 (at the direction of DECICCO and CC-3) all falsely told Insurer 3 that Tenant 1 was responsible for the boat when it sank. Insurer 3 agreed to advance the cost of raising the boat, contingent on receipt of a reasonable estimate and proof of insurance coverage for the marine salvage company. On or about November 21, 2017, an individual acting at DECICCO's direction submitted to Insurer 3 an estimate, in the amount of $15,890, for the cost of raising the boat. Insurer 3 refused payment because it never received proof of insurance for the salvaging operation. In or around December 2016, DECICCO paid an individual $2,000 in cash to raise the boat, and Tenant 1 hauled the boat out of the water for no charge. On or about December 8, 2016, DECICCO falsely told Insurer 3 that the United States

18

Coast Guard had required DECICCO to raise the boat, and DECICCO requested reimbursement for the cost. DECICCO then arranged for the preparation of a false invoice for raising and hauling the boat, in the amount of $16,250.

63.　　On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

**(1)　GARY P. DECICCO,**

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce, as follows:

| COUNT | APPROXIMATE WIRE DATE | WIRE TRANSMISSION |
|---|---|---|
| 5 | 2/16/2016 | $10,000 from an account held in the name of Insurer 1 at Citizens Bank in Rhode Island to Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 6 | 2/22/2016 | $22,000 from an account held in the name of Insurer 1 at Citizens Bank to Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 7 | 10/10/2016 | Email sent by DECICCO to Senior Claims Representative for Insurer 2, attaching fake invoices |

All in violation of Title 18, United States Code, Section 1343.

64.     On or about the date set forth below, in the District of Massachusetts and elsewhere, the defendant,

**(1)  GARY P. DECICCO,**

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud and attempting to do so, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, and attempting to do so in violation of 18 U.S.C. § 1343, as follows:

| COUNT | APPROXIMATE WIRE DATE | WIRE TRANSMISSION |
|-------|-----------------------|-------------------|
| 8 | 11/22/2016 | Email sent by DECICCO to M.M. regarding estimate for work relating to salvage of 1992 Blackfin boat |

All in violation of Title 18, United States Code, Section 1349.

## COUNTS NINE THROUGH FOURTEEN
### (18 U.S.C. § 1957 – Unlawful Monetary Transactions)

65.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4, 36 through 40, and 42 through 55 of this First Superseding Indictment.

66.     On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

### (1) GARY P. DECICCO,

knowingly engaged and attempted to engage in the following monetary transactions by, through, and to a financial institution affecting interstate commerce, that is, Bank of America, the deposits of which are insured by the Federal Deposit Insurance Corporation, in criminally derived property of a value greater than $10,000, which monetary transactions involved the proceeds of specified unlawful activity, that is, bank fraud, in violation of 18 U.S.C. § 1344:

| COUNT | AMOUNT | APPROXIMATE DATE | TRANSACTION |
|-------|--------|------------------|-------------|
| 9 | $1,206,000 | 9/22/2016 | Deposit of Bank of America check number 1117, made payable to Jeff Turco, Esq., drawn on Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC, into Leader Bank account number xxxxxx2913, held in the name of Law Office of Jeffrey R. Turco |

| | | | |
|---|---|---|---|
| 10 | $360,000 | 11/17/2016 | Purchase of Bank of America Cashier's Check No. 1456504938, payable to Harmon Law Office P.C., with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 11 | $586,010 | 11/30/2016 | Purchase of Bank of America Cashier's Check No. 1456504981, payable to GARY P. DECICCO, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 12 | $118,775 | 12/15/2016 | Purchase of Bank of America Cashier's Check No. 1456505043, payable to IAA, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 13 | $40,000 | 12/19/2016 | Purchase of Bank of America Cashier's Check No. 1456505056, payable to Godson Legal Group, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |
| 14 | $360,000 | 1/13/2017 | Purchase of Bank of America Cashier's Check No. 1456505149, payable to Godson Legal Group, with funds from Bank of America account number xxxxxxxx5259, held in the name of Atlantis Marina Docks, LLC |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT FIFTEEN
(18 U.S.C. § 371 – Conspiracy)

### General Allegations Regarding the Conspiracy

67.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4, 24 and 36 of this First Superseding Indictment.

68.     From at least April 2012 through in or about December 2017, DECICCO and AVEDISIAN conspired to defraud the United States for the purpose of impeding, impairing, obstructing and defeating the functions of the IRS in ascertaining, computing, assessing and collecting federal income taxes by, among other things, providing false information to the IRS and concealing DECICCO's income, financial transactions and assets from the IRS by putting such income, transactions and assets in the names of others, including AVEDISIAN.

69.     For instance, from at least as early as 2006 through in or around September 2016, DECICCO utilized the Class 2 Massachusetts Dealer License (Class 2 Dealer License) of Lynnway Auto Sales Inc. (Lynnway) to buy and sell high-end used vehicles. By purchasing and selling vehicles under the Lynnway license, DECICCO concealed his ownership of the vehicles from tax authorities and avoided paying sales and excise taxes for the purchase of the vehicles.

70.     DECICCO filed his individual federal income tax returns for 2006 and 2007 late, in or around November 2008. DECICCO did not pay the approximately $8,368 due and owing for 2006 and 2007 until in or around February 2010, after the IRS initiated a collection action and recorded a tax lien in or around December 2009.

71.     DECICCO filed his individual federal income tax returns for 2008, 2009, and 2010 late, on or about November 11, 2011. These returns reported tax due and owing of $593,410 (2008), $71,767 (2009) and $61,168 (2010), but DECICCO provided no payments with these returns. After the IRS began collection activities in or around March 2012,

23

DECICCO filed an appeal with the IRS claiming he misreported a capital gain for the 2008 tax year. In or around September 2013, the IRS agreed to reduce DECICCO's 2008 capital gain income, thereby reducing his 2008 tax assessment from $593,247 to $110,622.

72.     In the meantime, on or about March 29, 2012, the IRS sent DECICCO a "Final Notice, Notice of Intent to Levy and Notice of Your Right to a Hearing" (the Notice), which stated that DECICCO owed $1,104,500.32 in federal taxes, penalties and interest as of April 28, 2012, related to his individual federal income tax returns for 2008, 2009 and 2010.

73.     Between in or around April 2012 and in or around February 2013, DECICCO repeatedly told the IRS, including under penalty of perjury, that he did not have the ability to pay his outstanding tax liability, and that he had very little cash, no vehicles or real property, and no ownership interest in any asset with a positive value.

74.     In fact, DECICCO had ownership interests in several businesses, vehicles, and real properties between April 2012 and February 2013, which assets were held in the names of DECICCO, AVEDISIAN, Lynnway and/or other entities, the existence and/or true value of which DECICCO failed to disclose to the IRS. Specifically:

        a.      From at least March 2004 until at least September 2013, DECICCO had an interest in real property located at 59 Waters Avenue in Everett, Massachusetts. In 2012 and 2013, the property was held in the name of Waters Everett LLC, in which entity LIVI Realty LLC had a 33% ownership interest. LIVI Realty LLC was formed by DECICCO in February 2004, and DECICCO remained the owner of LIVI Realty LLC in 2012 and 2013.

        b.      From at least September 2005 until at least December 2017, DECICCO owned 200 units of membership in Meadowbrook Farm, LLC, which DECICCO purchased in the name of "GDC, LLC" for approximately $200,000. Meadowbrook Farm LLC owned the

Bank of New Hampshire Pavilion, an outdoor musical arts venue located in New Hampshire. Meadowbrook Farm, LLC issued yearly dividend checks made payable to GDC, LLC and/or DECICCO in 2012, 2014 and 2015, in amounts ranging from approximately $5,300 to approximately $6,700. DECICCO deposited the 2012 check into Bank of America account number xxxxxxxx9941, held in the name of GDC Construction LLC (the GDC 9941 account), an entity DECICCO formed in 2005. DECICCO deposited the 2013 and 2014 checks into Bank of America account number xxxxxxxx0911, held in the name of GDC Construction LLC (the GDC 0911 account).

   c.  From at least April 2006 until in or around April 2013, DECICCO owned a 2006 Boss Hoss motorcycle, which he purchased for approximately $44,000 using the Lynnway Class 2 Dealer License.

   d.  By in or around December 2010, DECICCO owned an 85% interest in 60 Salem Turnpike LLC, which held title to the commercial real estate located at 60 Salem Turnpike in Saugus, Massachusetts.

   e.  From in or around December 2010 until in or around April 2013, DECICCO owned a yacht named the "Baroness," which was titled in the name of Crawford Jones Ltd., a Marshall Islands corporation. DECICCO purchased the Baroness for approximately $1.35 million; DECICCO wired approximately $550,000 from his personal Bank of America checking account number xxxxx0454 (the DECICCO 0454 account), and provided two boats and a Mercedes-Benz, to pay for the Baroness. Crawford Jones Ltd., *i.e.* DECICCO, had no outstanding loans related to the Baroness in 2012 or 2013.

   f.  From on or about September 25, 2011 until on or about September 15, 2012, DECICCO owned a 2008 Mercedes-Benz GL450. DECICCO purchased the 2008

Mercedes-Benz GL450 for approximately $38,500, using a trade-in vehicle valued at $12,000 and a check in the amount of $26,794, drawn on the GDC 9941 account, towards the purchase price.

g.      From in or around March 2012 until in or around April 2012, DECICCO owned a 2012 Mercedes-Benz S550V4, which he purchased in AVEDISIAN's name, using a $96,604.25 check drawn on AVEDISIAN's personal Bank of America account number xxxxxxxx5588 (the AVEDISIAN 5588 account).

h.      From in or around April 2012 until in or around August 2012, DECICCO owned a 2012 Maserati, which was titled in AVEDISIAN's name. DECICCO traded the 2012 Mercedes-Benz S550V4 described in Paragraph 74(g) for the 2012 Maserati, using Lynnway to conduct the trade.

i.      From in or around August 2012 until in or around September 2012, DECICCO owned a 2009 Mercedes SL63 AMG, which was titled in AVEDISIAN's name. DECICCO and AVEDISIAN traded the 2012 Maserati described in Paragraph 74(h) for the 2009 Mercedes SL63 AMG. A check for $29,554, representing the difference between the trade-in value of the 2012 Maserati and the purchase price of the 2009 Mercedes SL63 AMG, was deposited into the AVEDISIAN 5588 account on or about August 7, 2012.

j.      On or about September 15, 2012, DECICCO and AVEDISIAN traded in the 2008 Mercedes-Benz GL450 referred to in Paragraph 74(f) and the 2009 Mercedes SL63 AMG referred to in Paragraph 74(i), and they were credited approximately $103,000 towards the purchase of a 2013 Mercedes-Benz GL450 held in AVEDISIAN's name. The 2013 Mercedes-Benz GL450 cost approximately $66,923, and a check for $36,077, representing the difference between the trade-in values of the 2008 Mercedes-Benz GL450 and the 2009 Mercedes SL63

26

AMG and the purchase price of the 2013 Mercedes-Benz GL450, was deposited into the AVEDISIAN 5588 account on or about September 19, 2012.

k.　　On or about January 23, 2013, DECICCO and AVEDISIAN traded in the 2013 Mercedes-Benz GL450, and they were credited approximately $18,500 towards the purchase of a 2008 Chevrolet Avalanche in AVEDISIAN's name. A check in the amount of $45,077, representing the difference between the trade-in value of the 2013 Mercedes-Benz GL450 and the sale price of the 2008 Chevrolet Avalanche, was deposited into the AVEDISIAN 5588 account on or about January 25, 2013.

l.　　On or about December 30, 2011, DECICCO acquired a primary membership interest in Atlantis Marina Docks LLC, which interest DECICCO and AVEDISIAN agreed would be held in the name of AVEDISIAN. Atlantis Marina Docks LLC owned property located at 550 Pleasant Street #101 and Pleasant Ct. Rear, both in Winthrop, Massachusetts. The company also operated a marina in Winthrop.

m.　　By in or around January 2012, DECICCO had a 100% ownership interest in Thayer Avenue Development Company, LLC, which held title to the commercial real estate located at 29 Thayer Avenue in Revere, Massachusetts. In or around July 2012, DECICCO sold a 50% ownership interest in Thayer Avenue Development Company, LLC for approximately $700,000, and retained a 50% ownership interest in Thayer Avenue Development Company, LLC, which DECICCO placed in AVEDISIAN's name.

n.　　Between in or around March 2012 and in or around May 2012, DECICCO owned a 2012 Harley Davidson, which he purchased in his own name for approximately $36,699. DECICCO traded in another vehicle and paid the remaining approximately $17,500 of the purchase price with a cashier's check drawn on the AVEDISIAN 5588 account.

27

o.   Between in or around May 2012 and at least the Fall of 2013, DECICCO owned a 41-foot boat named "What Next." DECICCO used the 2012 Harley Davidson referred to in Paragraph 74(n) towards the purchase of the What Next, in addition to a $17,500 check drawn on the AVEDISIAN 5588 account.

p.   On or about August 30, 2012, DECICCO used Lynnway's Class 2 Dealer License to purchase a 2005 Lamborghini Murcielago for approximately $123,000; the funds were wired from the AVEDISIAN 5588 account to the seller.

75.   Based in part on DECICCO's false representations in 2012 and 2013 that he had no ability to pay his outstanding tax liabilities, the IRS accepted DECICCO's proposal in or around March 2013, that he make monthly payments to the IRS in the amount of $3,300, towards his outstanding tax obligation. From in or around March 2013 until in or around March 2015, DECICCO made 22 payments, each in the amount of $3,300, towards his tax obligation. DECICCO also made a $3,000 payment in December 2016, and a $3,000 payment in March 2017. DECICCO made no other payments, and as of September 2016, DECICCO owed approximately $340,000 to the IRS, which sum included interest which has continued to accrue.

76.   Instead of paying the outstanding tax liability from his 2008, 2009 and 2010 tax returns, or at least making his $3,300 monthly payments towards the liability, DECICCO continued to buy and sell assets and hide his assets and income in the names of AVEDISIAN, Lynnway and other entities after February 2013.

## The Conspiracy to Defraud the IRS

77.     From in or about April 2012 to in or about December 2017, in the District of
Massachusetts and elsewhere, the defendants,

**(1) GARY P. DECICCO, and
(2) PAMELA M. AVEDISIAN,**

and others known and unknown to the Grand Jury, conspired with each other to defraud the
United States for the purpose of impeding, impairing, obstructing, and defeating the lawful
government functions of the IRS, an agency of the United States, in ascertaining, computing,
assessing and collecting federal income taxes.

## Manner and Means

78.     DECCICO and AVEDISIAN, and others known and unknown to the Grand Jury,
carried out the conspiracy to defraud by concealing DECICCO's income, financial transactions
and assets through at least the following means, among others:

        a.      providing false information to the IRS about DECICCO's and
AVEDISIAN's income, financial transactions and assets;

        b.      concealing DECICCO's income, financial transactions and assets from the
IRS by, among other things, putting such income, transactions and assets in the names of others,
including AVEDISIAN.

## Overt Acts

79.     Between approximately April 2012 and December 2017, DECICCO and
AVEDISIAN committed the following overt acts, among others, in furtherance of the
conspiracy:

        a.      On or about April 3, 2012, DECICCO completed and submitted to the IRS
a Form 433-A, Collection Information Statement for Individuals, falsely stating under penalty of

perjury that, aside from an ownership interest in an entity called Marginal Street LLC, DECICCO had no cash, bank accounts, real property, personal vehicles (to include boats and motorcycles), or other assets, and that DECICCO was unemployed.

b.     On or about April 9, 2012, DECICCO completed and submitted to the IRS a Form 433-B, Collection Information Statement for Businesses, falsely stating under penalty of perjury that he had ownership interests in only two companies: 245 and 257 Marginal Street LLC and VLD LLC.

c.     In or around July 2012, AVEDISIAN attended the closing and signed the documents putting DECICCO's 50% interest in Thayer Avenue Development Company, LLC in her name.

d.     On or about September 26, 2012, DECICCO falsely told an IRS revenue officer that his previously submitted Forms 433-A and 433-B were still accurate and that he still lacked the ability to pay his outstanding tax liabilities.

e.     On or about September 26, 2012, DECICCO falsely told an IRS revenue officer that GDC Construction LLC was out of business.

f.     On or about February 1, 2013, DECICCO completed and submitted to the IRS another Form 433-A, Collection Information Statement for Individuals, falsely stating under penalty of perjury that he owned no cash, bank accounts, real property, personal vehicles (to include boats and motorcycles), or assets other than $1,500 in "personal goods" and $100 cash on hand.

g.     On the same February 1, 2013 Form 433-A, DECICCO disclosed that he owned 100 shares in "CRAWFORD JONES LTD," but falsely stated that there was no equity in the shares because a loan balance of $850,000 was in excess of the current value of $700,000.

h. On the same February 1, 2013 Form 433-A, DECICCO falsely stated that he owned only the following investments: VLD LLC (with an account balance of -$3,000,000), 58 Pulaski, LLC (with an account balance of -$100,000), PAGD Realty, LLC (with an account balance of $0), and On the Sea Property Management (with an account balance of $0).

i. In or around March 2013, after the IRS accepted DECICCO's proposed $3,300 monthly payment plan (based on the false information DECICCO provided about his assets and income), DECICCO obtained a loan or advance against LIVI Realty LLC's future share of the proceeds for the sale of 59 Waters Avenue, Everett, Massachusetts, and deposited $300,000 into Bank of America account number xxxxxxxx4266, held in the name of GDC Construction LLC (the GDC 4266 account).

j. In or around April 2013, DECICCO traded in his Boss Hoss motorcycle, and used the $49,500 trade-in allowance to purchase a 2008 Range Rover in AVEDISIAN's name for approximately $49,704.

k. In or around April 2013, DECICCO purchased a 2007 Bentley for approximately $98,500 using Lynnway's Class 2 Dealer License to conceal his ownership of the vehicle. To purchase the 2007 Bentley, DECICCO traded in the 2008 Range Rover referred to in Paragraph 79(j), and wired $43,500 from the GDC 4266 account.

l. In or around April 2013, DECICCO sold the Baroness yacht for approximately $950,000, including a check for approximately $277,000, which he deposited into the GDC 0911 account in or around June 2013.

m. In or around June 2013, DECICCO purchased a 2010 Rolls Royce for approximately $280,000, using Lynnway's Class 2 Dealer License to conceal his ownership of the vehicle. To purchase the Rolls Royce, DECICCO traded in the 2007 Bentley referred to in

31

Paragraph 79(k) and provided a $145,000 cashier's check purchased with funds from the GDC 0911 account.

n.      In or around June 2013, DECICCO purchased a 2007 Mercedes S550V4 in AVEDISIAN's name for $24,794, using a $24,500 cashier's check purchased with funds from the GDC 0911 account.

o.      In or around June 2013, DECICCO purchased a 2004 Ferrari for $85,594 using Lynnway's Class 2 Dealer License to conceal his ownership of the vehicle. To purchase the 2004 Ferrari, DECICCO provided a $85,594 cashier's check purchased with funds from the GDC 0911 account.

p.      In or around September 2013, DECICCO deposited a check for approximately $399,583.33 into Bank of America account number xxxxxxxx8952, held in the name of Atlantis Marina Docks LLC (the Atlantis 8952 account). The check represented a portion of LIVI Realty Inc.'s share of the proceeds of the sale of 59 Waters Avenue, Everett, Massachusetts.

q.      In or around December 2013, DECICCO deposited a check for approximately $9,261.50 into Bank of America account number xxxxxxxx5706, held in the name of DECICCO (the DECICCO 5706 account). The check represented a portion of LIVI Realty Inc.'s share of the proceeds of the sale of 59 Waters Avenue, Everett, Massachusetts.

r.      In or around December 2013, DECICCO purchased a 2008 Lamborghini for approximately $113,000, using funds on deposit in the Atlantis 8952 account.

s.      In or around June 2014, DECICCO used approximately $70,000 of CC-3's money to purchase the "Thundercat," a 48-foot catamaran, in the name of Lynnway.

t.      Between in or around April 2015 and in or around August 2016, DECICCO issued to himself more than $500,000 in distribution checks from The Mills at Pulaski LLC.

u.      In or around September 2016, DECICCO purportedly sold The Mills at Pulaski, LLC to CC-3; the proceeds of the sale were approximately $3.4 million. Faced with the possibility of a large capital gains tax on the proceeds of the Pulaski sale, DECICCO took steps to falsely make it appear as if he used the $3.4 million in Pulaski sale proceeds to purchase a 100% ownership interest in Atlantis Marina Docks, LLC from AVEDISIAN as a qualifying like kind exchange under IRS Section 1031.

v.      In or around October and November 2016, DECICCO used $610,000 of AVEDESIAN's purported proceeds of the sale of Atlantis Marina Docks, LLC to "purchase" 321 Nahant from AVEDISIAN.

w.      On or about November 17, 2016, AVEDISIAN purchased Bank of America Cashier's Check Number 1456504938, made payable to Harmon Law Office P.C. (the Harmon Check), in the amount of $360,000, with funds on deposit in the Atlantis 5259 account.

x.      In or around November 2016, DECICCO used the Harmon Check to purchase an interest in 89 Shelton Road, Swampscott, Massachusetts.

y.      In or around November 2016, DECICCO used approximately $22,572 from the GDC 0911 account to purchase a 2012 Fisker Karma in the name of Brothers Auto Body. The funds on deposit in the GDC 0911 account included funds transferred from the Atlantis 5259 account (which contained AVEDISIAN's purported proceeds from the sale of Atlantis Marina Docks, LLC) and funds DECICCO received from his 2013 sale of the Baroness.

z.      In or around December 2016, DECICCO used $118,775 of AVEDISIAN's purported proceeds of the sale of Atlantis Marina Docks, LLC to purchase a 2010 Ferrari in the name of Brothers Auto Body.

aa.      In or around July 2017, AVEDISIAN obtained a General Durable Power of Attorney, and a Limited Power of Attorney from DECICCO, giving her authority to, among other things, obtain funds due to DECICCO from the sale of assets.

bb.      In or around July 2017, AVEDISIAN deposited the proceeds of the sale of DECICCO's 2008 Lamborghini and 2012 Fisker Karma, totaling approximately $130,568.35, into the AVEDISIAN 5588 account.

cc.      In or around December 2017, AVEDISIAN concealed the proceeds from the sale of DECICCO's 2010 Ferrari, totaling approximately $60,000, by making the check for the sale proceeds payable to herself and then depositing the check into the AVEDISIAN 5588 account.

dd.      In or around December 2017, AVEDISIAN, purportedly acting on behalf of DECICCO pursuant to the July 2017 General Durable Power of Attorney, entered into a Redemption Agreement whereby DECICCO sold his 200 units of membership in Meadowbrook Farm, LLC for $600,000, which amount was split between AVEDISIAN and DECICCO.

ee.      On her 2013 IRS Form 1040, filed in or around March 2017, AVEDISIAN falsely claimed: (a) that she owned 60 Salem Turnpike in Saugus, Massachusetts; (b) that she owned 550 Pleasant Street in Winthrop, Massachusetts; and (c) that she had an ownership interest in Thayer Avenue Development Company, LLC.

## COUNT SIXTEEN
(26 U.S.C. § 7201 – Tax Evasion)

80.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 4, 24 and 36, 68 through 76, 78 and 79 of this First Superseding Indictment.

81.     From in or about April 2012 to in or about December 2017, in the District of Massachusetts and elsewhere, the defendants,

**(1) GARY P. DECICCO, and
(2) PAMELA M. AVEDISIAN,**

did willfully attempt to evade and defeat the payment of a substantial part of the taxes due and owing by GARY P. DECICCO to the United States of America for the tax years 2008, 2009 and 2010 by committing the following affirmative acts, among others: (a) titling assets belonging to DECICCO in the name of AVEDISIAN to hide such assets; (b) using bank accounts held in the name of AVEDISIAN to hide assets and income belonging to DECICCO; (c) using entities DECICCO controlled to hide assets and income belonging to DECICCO; (d) using the Lynnway Auto Sales Inc. Class 2 Massachusetts Dealer License to buy and sell vehicles; and (e) submitting and causing the submission of false information to the IRS.

All in violation of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2.

## FIRST WIRE FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.      Upon conviction of any offense alleged in Counts One or Two of this Superseding Indictment,

**(1) GARY P. DECICCO, and
(2) PAMELA M. AVEDISIAN,**

defendants herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense. Such property includes, without limitation:

      a.      the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1.

2.      If any of the property described in Paragraph 1 above as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act and omission of the defendants –

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with a third party;

      c.      has been placed beyond the jurisdiction of this Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 1 above, including but not limited to:

a. Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida;

b. 550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

c. A certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

d. all right, title and interest in the Atlantis Marina Docks, LLC;

e. one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517.200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

f. the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

g. the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

h. the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## BANK FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1. Upon conviction of any offense alleged in Counts Three or Four of this Superseding Indictment,

### (1) GARY P. DECICCO,

defendant herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses. Such property includes, without limitation, the following:

 a. the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1;

 a. Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida;

 b. 550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

 c. A certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

 d. all right, title and interest in the Atlantis Marina Docks, LLC; and

 e. one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517.

2. If any of the property described in Paragraph 1 above as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2)(A), as a result of any act and omission of the defendant –

 a. cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with a third party;

c.     has been placed beyond the jurisdiction of this Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above, including but not limited to:

a.     200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

b.     the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

c.     the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

d.     the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## SECOND WIRE FRAUD FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.     Upon conviction of any offense alleged in Counts Five through Eight of this Superseding Indictment,

### (1) GARY P. DECICCO,

defendant herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

2.     If any of the property described in Paragraph 1 above as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act and omission of the defendant --

　　a.     cannot be located upon the exercise of due diligence;

　　b.     has been transferred or sold to, or deposited with a third party;

　　c.     has been placed beyond the jurisdiction of this Court;

　　d.     has been substantially diminished in value; or

　　e.     has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above, including but not limited to:

　　a.     the real property and buildings located at 321 Nahant Road, Nahant, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35494, Page 1;

b.      Unit 1704 THE LANDMARK, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of the Public Records of Miami-Dade County, Florida;

c.      550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

d.      A certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

e.      all right, title and interest in the Atlantis Marina Docks, LLC;

f.      one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number ZFF67NFA2A0175517;

g.      200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

h.      the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

i.      the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

j.      the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A).

## MONEY LAUNDERING FORFEITURE ALLEGATIONS

The Grand Jury further finds probable cause to believe that:

1.     Upon conviction of one or more of the offenses in violation of 18 U.S.C. § 1957

charged in Counts Nine through Fourteen of this Superseding Indictment,

### (1) GARY P. DECICCO,

the defendant herein, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), any

property, real or personal, involved in such offenses, or any property traceable to such property,

including but not limited to:

   a.     the real property and buildings located at 321 Nahant Road, Nahant,
          Massachusetts, having a deed recorded at the Southern Essex County
          Registry of Deeds, Book 35494, Page 1;

   b.     Unit 1704 THE LANDMARK, a Condominium, according to the
          Declaration of Condominium recorded in O.R. Book 14583, Page 2063 of
          the Public Records of Miami-Dade County, Florida; and

   c.     one white 2010 Ferrari 458 Italia, bearing Vehicle Identification Number
          ZFF67NFA2A0175517.

2.     If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act and omission of

the defendant --

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with a third party;

   c.     has been placed beyond the jurisdiction of this Court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property which cannot be divided
          without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above, including but not limited to:

a.  550 Pleasant Street, Unit MOR-101, Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 9;

b.  a certain parcel of land known as Lot C on a plan of land by Joseph Selwyn recorded with Suffolk Registry of Deeds, Book 8121, Page 192, situated in Winthrop, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds, Book 46794, Page 15;

c.  all right, title and interest in the Atlantis Marina Docks, LLC;

d.  200 units of Meadowbrook Farm, L.L.C., as described in Stock Certificate 31, dated January 7, 2006;

e.  the real property and buildings located at 119 Rear Foster Street, Peabody, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 35499, Page 318;

f.  the real property and buildings located at 60 Salem Turnpike, Saugus, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 30154, Page 347; and

g.  the real property and buildings located at 7 and 29 Thayer Avenue, Revere, Massachusetts, having a deed recorded at the Southern Essex County Registry of Deeds, Book 49938, Page 53.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

_David Bowen_

FOREPERSON OF THE GRAND JURY

_Kristina Barclay_

KRISTINA E. BARCLAY
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS, _Jan 31_, 2019

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

_Matthew A. Putnam_
1629 pm

44