```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                      )
 4   UNITED STATES OF AMERICA,          )
                                        )
 5           Plaintiff,                 )
                                        )  Criminal Action
 6   v.                                 )  No. 1:18-cr-10013-RGS
                                        )
 7   GARY P. DECICCO,                   )
                                        )
 8           Defendant.                 )
                                        )
 9

10

11              BEFORE THE HONORABLE JUDITH G. DEIN
                   UNITED STATES MAGISTRATE JUDGE
12

13                 BOND REVOCATION HEARING - DAY 1

14

15                        March 22, 2019

16

17          John J. Moakley United States Courthouse
                       One Courthouse Way
18               Boston, Massachusetts 02210

19

20

21

22              Linda Walsh, RPR, CRR
                    Official Court Reporter
23          John J. Moakley United States Courthouse
                One Courthouse Way, Room 5205
24              Boston, Massachusetts 02210
                    lwalshsteno@gmail.com
25
```

```
 1   APPEARANCES:

 2   On Behalf of the Government:

 3        UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Kristina E. Barclay
 4        One Courthouse Way, Suite 9200
          Boston, Massachusetts 02210
 5        617-748-3371
          Kristina.barclay@usdoj.gov
 6

 7   On Behalf of the Defendant:

 8        MINER ORKAND SIDDALL LLP
          By: Tracy A. Miner, Esq.
 9            Megan Siddall, Esq.
          470 Atlantic Avenue, 4th Floor
10        Boston, Massachusett 02210
          617-273-8421
11        tminer@mosllp.com

12

13

14

15             Proceedings recorded by sound recording and
                 produced by computer-aided stenography.
16

17

18

19

20

21

22

23

24

25
```

1                            INDEX

2    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3    MATTHEW ELIO

4        By Ms. Barclay              6              61
         By Ms. Miner                     43              66
5

6                        E X H I B I T S

7
                            DESCRIPTION                    RECEIVED
8
     GOVERNMENT EXHIBITS
9
         1       RMV-1........................................    9
10
         2       Check dated 11/17/18 from MAPFRE Insurance to
11               Gary DeCicco.................................   17

12       3       Statement request...........................   18

13       4       Online claim filed by Mr. DeCicco...........   19

14       5       GPS data....................................   22

15       6       GPS data....................................   22

16       7       CD of recorded call between Mr. DeCicco and
                 Commerce....................................   24
17
         8       Tow invoice.................................   26
18
         9       Three checks from Commerce Insurance for claim. 27
19
         10      General ledgers from Atlantis Marina bank
20               account.....................................   32

21       11      RMV-1, 2011 Cadillac CTS....................   33

22       12      Contract between Pamela Avedisian and Anthony
                 and Joe Deluca..............................   36
23
         13      Guarantee by Mr. DeCicco....................   36
24

25

EXHIBITS (continued)

14    Acknowledgement of payment dated July 31,
      2012, of $50,000................................    37

15    Email dated July 27, 2018.....................    38

19    Title.........................................    62

20    Check dated August 23, 2018, to DOT...........    64


                        DESCRIPTION              RECEIVED

DEFENDANT EXHIBITS

16    Documents subpoenaed from Commerce Insurance...    47

17    Email from Jonathan Crafts to Sandra Lemanski..    55

18    Email between Kristina Barclay and Jonathan
      Crafts.......................................    56

* * * *

```
1                     P R O C E E D I N G S

2             (Recording begins at 2:42:53)

3             THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session on March 22nd, the

5    year 2019, in the matter of United States of America versus

6    Gary DeCicco, Criminal Case Number 2018-10013.

7             Could counsel please identify themselves for the

8    record.

9             MS. BARCLAY:  Good afternoon, Your Honor.  Kristina

10   Barclay for the United States.

11            THE COURT:  Good afternoon.

12            MS. MINER:  Good afternoon, Your Honor.  Tracy Miner

13   and Megan Siddall for Gary DeCicco.

14            THE COURT:  Okay.  I'm sorry.  I didn't get your name.

15            MS. SIDDALL:  Megan Siddall, Your Honor.

16            THE COURT:  All right.  So we're here on the

17   Government's motion for revocation of release of Mr. DeCicco.

18   And there's a recently filed motion to modify the conditions of

19   release, but that's -- I take that as somewhat related but

20   tangential.  So let -- how do you want to proceed?

21            MS. BARCLAY:  Your Honor, the Government has a witness

22   I can call.

23            THE COURT:  Okay.

24            MS. BARCLAY:  The Government calls Special Agent

25   Matthew Elio.
```

```
 1              THE CLERK:  Please raise your right hand.

 2              (Witness sworn.)

 3              THE WITNESS:  I do.

 4              THE CLERK:  Please be seated.  Please state your full

 5    name, spelling your last name for the record.

 6              THE WITNESS:  Sorry.  Matthew Elio, E-l-i-o.

 7              MS. BARCLAY:  May I proceed, Your Honor?

 8              THE COURT:  Yes.

 9              MATTHEW ELIO, having been duly sworn by the Clerk, was

10    examined and testified as follows:

11                          DIRECT EXAMINATION

12    BY MS. BARCLAY:

13    Q.   Good afternoon.  Could you please tell us where you work,

14    what you do for work.

15    A.   Special agent with the FBI in Chelsea.

16    Q.   And how long have you been a special agent with the FBI?

17    A.   Since 2005.

18    Q.   And you're assigned to the Boston office?

19    A.   Yes.

20    Q.   How long have you been in the Boston office?

21    A.   Since 2009.

22    Q.   And where were you before that?

23    A.   In the Bridgeport, Connecticut resident agency out of the

24    New Haven division.

25    Q.   What -- as a special agent with the FBI, what are your
```

1    duties and responsibilities?

2    A.   I'm assigned to a public corruption squad.  We investigate

3    a number of different criminal violations.  As part of that, we

4    interview folks, serve subpoenas, do all sorts of investigative

5    work.

6    Q.   And while you've been at the Boston office, have you been

7    involved in investigations related to the defendant in this

8    case, Gary DeCicco?

9    A.   Yes.

10   Q.   And you are one of the case agents for the case that's

11   currently before this Court, the indictment that was returned

12   in January of 2018 and the superseding indictment returned in

13   January of '19; is that accurate?

14   A.   Yes.

15   Q.   At some point did you become aware that there was a 2012

16   Corvette registered to the defendant, Gary DeCicco?

17   A.   Yes.

18   Q.   Approximately when did you become aware of that?

19   A.   In the fall of 2018.

20   Q.   And when you became aware of that, what did you do -- or

21   what did the investigators do?

22   A.   We became aware when we ran an NCIC of Mr. DeCicco and

23   noticed that a Corvette was registered in his name, and then

24   once we identified the Corvette, we obtained the RMV-1

25   information from the Registry.

1   Q.   Is that from the Massachusetts registry?

2   A.   Yes.

3   Q.   Okay.  I am going to give you what's been marked as

4   Government Exhibit 1.  Do you recognize that document?

5   A.   I do.

6            MS. BARCLAY:  Your Honor, may I approach?

7            THE COURT:  Yes.

8            MS. BARCLAY:  Do you want copies or is --

9            THE COURT:  That would be helpful.

10           MS. BARCLAY:  Okay.  I haven't put numbers on

11   everything so I'll try to do that beforehand.

12   BY MS. BARCLAY:

13   Q.   Do you recognize Exhibit 1?

14   A.   I do.

15   Q.   What is it?

16   A.   It's a RMV-1 for a 2012 Chevy Corvette.

17   Q.   And approximately when -- just to be clear, we talked

18   before, and you're one of the agents involved in the

19   investigation of Mr. DeCicco.  What other agency is involved?

20   A.   The IRS.

21   Q.   And who's the agent involved from the IRS?

22   A.   Sandra Lemanski.

23           THE COURT:  Is there any -- before you use this, is

24   there any objection to the exhibit?

25           MS. MINER:  No, Your Honor.  Thank you.

```
 1              THE COURT:  Okay.  Marked as Exhibit 1.
 2              (Government Exhibit 1 received in evidence.)
 3   BY MS. BARCLAY:
 4   Q.   Okay.  And what is this RMV-1?  What is the car that this
 5   RMV-1 relates to?
 6   A.   A 2012 Chevy Corvette.
 7   Q.   And just taking a look at where it has number 11, year,
 8   that's the 2012; is that correct?
 9   A.   Yes.
10   Q.   And Chevy Corvette?
11   A.   Yes.
12   Q.   And what's the owner information in line 25?
13   A.   Gary P. DeCicco.
14   Q.   And 35, the date of purchase?
15   A.   August 17th, 2018.
16   Q.   Okay.  And the total sale price for the car?
17   A.   $20,000.
18   Q.   And that's according to this form?
19   A.   According to this, yes.
20   Q.   And the fee information, what does it have there?
21   A.   Either thirteen-fifty or thirteen-fifty-six.
22   Q.   And there are signatures on this document; is that
23   correct?
24   A.   Yes.
25   Q.   And the first signature in line 51, who does that purport
```

1  to be?

2  A.    It appears to be Gary DeCicco.

3  Q.    And could you read the line just above the signature.

4  A.    "We hereby further certify that all information contained

5  in this application is true and correct to the best of my

6  knowledge and behalf [sic].  We understand that false

7  statements are punishable by fine, imprisonment or both."

8  Q.    And there's nothing on this form about a trade-in of a

9  truck or anything like that, right?

10  A.    No.  That would be on the column under the $20,000, and

11  there's nothing listed.

12  Q.    There's a last trade-in allowance line right there that

13  I'm pointing to?

14  A.    Yes.

15  Q.    Okay.  What, if any, significance did Mr. DeCicco's sworn

16  statement that he bought a 2012 Corvette in August of 2018 for

17  $20,000 have to investigators?

18  A.    In August of 2018 Mr. DeCicco was under pretrial

19  conditions of release where he was not to conduct financial

20  transactions over $1,000.

21  Q.    Without the Government's permission?

22  A.    Yes.

23  Q.    Okay.  After you received the information or after

24  investigators received the information from the RMV, what did

25  they do next, or what did you do next?

1   A.    We contacted Mr. Carroll.

2   Q.    And who is Mr. Carroll?

3   A.    He's the individual listed as "Authorized dealer's

4   signature" on this RMV-1.

5   Q.    And approximately when did you talk to Mr. Carroll?

6   A.    I believe it was March 1st.  End of February, early March

7   of this year, 2019.

8   Q.    What did he tell you about the Corvette?

9   A.    Mr. Carroll told us that he originally bought this vehicle

10  from a Copart auction because he enjoyed rebuilding engines,

11  and the vehicle needed an engine rebuilt.  And then some time

12  prior to Mr. DeCicco going to prison in 2017, he had traded

13  this vehicle for a pickup truck with Mr. DeCicco, and that --

14          THE COURT:  Wait.  I'm sorry.  He, Mr. DeCicco, had a

15  pickup truck that he traded?

16          THE WITNESS:  According to Mr. Carroll, yes, for this

17  Corvette.

18  A.    And shortly thereafter, Mr. DeCicco was incarcerated, and

19  the Corvette went to Lynnway Auto Sales where Mr. Carroll

20  believed it went for sale.  And at some point Lynnway Auto

21  Sales was trying to sell the vehicle, they had an issue selling

22  it because the vehicle couldn't get an inspection.  Shortly

23  after Mr. DeCicco was out of release from prison in the spring,

24  June of '18, he received a phone call from Mr. Aswad that

25  Mr. DeCicco wanted the Corvette back.

1    Q.   And what, if anything, did Mr. Carroll do?

2    A.   Mr. Carroll said he prepared this RMV-1 paperwork and

3    delivered this paperwork, along with a check for the sales tax,

4    and the vehicle to Mr. DeCicco at Thayer Ave.

5    Q.   And that's in Revere?

6    A.   Yes.

7    Q.   Did Mr. Carroll file this form with the RMV or did he say

8    that he filed this form with the RMV?

9    A.   No.

10   Q.   Did he say he signed Mr. DeCicco's name to the signature

11   line, to the penalties of perjury signature line?

12   A.   No.

13   Q.   And you mentioned Lynnway Auto.  What is Lynnway Auto?

14   A.   Lynnway Auto is a used car dealership on the Lynnway in

15   Lynn that is owned by Richard Aswad.

16   Q.   Have you ever met Mr. Aswad before?

17   A.   Yes.

18   Q.   What was the relationship, if any, between Mr. Aswad and

19   Mr. DeCicco?

20   A.   They used to be friends.  Mr. DeCicco used to use Lynnway

21   Auto Sales' dealer license to buy and sell vehicles.  Mr. Aswad

22   is a witness in Mr. DeCicco's pending case.  And according to

23   Mr. Aswad, he's not going to do business with him any longer

24   because he's precluded to.

25   Q.   And what did you -- you told Mr. Aswad about the Corvette?

```
 1    A.    Yes.

 2    Q.    And what did he say?

 3    A.    He said that he received a phone call from Walter Hanson,

 4    who's a mechanic, shortly after Mr. DeCicco was released from

 5    prison, who informed Mr. Aswad that Mr. DeCicco wanted the

 6    Corvette back.  When he learned that he wanted the Corvette

 7    back, he contacted Mr. Carroll and asked him to do him a favor

 8    and paper this transaction because Mr. Aswad is not allowed to

 9    have any transactions with Mr. DeCicco.

10    Q.    And just to be clear, so Mr. DeCicco, according to

11    Mr. Aswad at least, Mr. DeCicco used Walter Hanson to

12    indirectly contact Mr. Aswad, who was a witness -- on the

13    Government's witness list on this case?

14          MS. MINER:  Objection.  Not the testimony.

15          THE COURT:  Overruled.

16    A.    Yes.  Mr. Aswad said that he received a phone call from

17    Mr. Hanson saying that Mr. DeCicco wanted that vehicle back.

18    Q.    And Mr. Hanson is not one of Mr. DeCicco's lawyers,

19    correct?

20    A.    No.

21    Q.    Now, you said that Mr. DeCicco had used Mr. Aswad's dealer

22    license in order to buy and sell vehicles.  Is that part of the

23    conduct that's alleged in the superseding indictment in this

24    case?

25    A.    Yes.
```

1  Q.   And by doing that, what benefit is it to Mr. DeCicco, if

2  any?

3  A.   A number of benefits.  One, he doesn't have to pay sales

4  tax when he buys and sells vehicles.  He doesn't have to insure

5  the vehicles.  He doesn't have to register them with the

6  Commonwealth of Massachusetts.  Therefore, there's never any

7  record with respect to what vehicles he owns or has owned.

8  Q.   So if the IRS goes to the RMV to look for Mr. DeCicco's

9  assets because he has an outstanding tax lien, it won't show

10  up; is that accurate?

11  A.   If it's in the name of Lynnway Auto Sales, it will not

12  show up in Mr. DeCicco's name.

13  Q.   Just to be clear, Special Agent Elio, you don't personally

14  know when Mr. DeCicco bought the Corvette and for how much he

15  bought it for?

16  A.   No.

17  Q.   You just know that the RMV-1, the official record that's

18  signed under the penalties of perjury and filed with a state

19  agency, says that Mr. DeCicco bought it in August 2018 for

20  $20,000?

21  A.   Yes.

22  Q.   Are you -- Special Agent Elio, are you familiar with

23  Mr. DeCicco's criminal history?

24  A.   Yes.

25  Q.   And does he have any federal convictions?

1    A.    Yes.

2    Q.    What were they and from when?

3    A.    A 2005 mail fraud conviction for an insurance fraud

4    matter.

5    Q.    And you're familiar obviously with the original indictment

6    that was returned in January of 2018?

7    A.    Yes.

8    Q.    And Counts 5 through 8 of that indictment charged

9    Mr. DeCicco with wire fraud and attempted wire fraud; is that

10   accurate?

11   A.    Yes.

12   Q.    And those relate to insurance claims.

13   A.    Yes.   Three different claims.

14   Q.    And how many insurance company victims were there alleged

15   in the indictment?

16   A.    I believe three.

17   Q.    And did one of those claims relate to a Maserati?

18   A.    Yes.

19   Q.    What were the allegations, just the allegations in the

20   indictment?

21   A.    That Mr. DeCicco used an auto body shop to submit a false

22   invoice indicating new tires and a clutch were put on a vehicle

23   that was totalled from a car accident.

24   Q.    So to get more money than the insurance company was

25   originally going to pay?

1    A.    Yes, according to the individual that owned the body shop.

2    Q.    What was the name of the insurance company victim for

3    that?

4    A.    MAPFRE.

5    Q.    Is it also known as Commerce?

6    A.    Yes.

7    Q.    And the investigation continued after the return of the

8    original indictment in 2018 --

9    A.    Yes.

10   Q.    -- in particular?

11         And as part of that investigation, were records

12   subpoenaed by the grand jury?

13   A.    Yes.

14   Q.    Including bank records?

15   A.    Yes.

16   Q.    And in particular, an account for Atlantis Marina Docks

17   LLC?

18   A.    Yes.

19   Q.    And were those records reviewed by investigators?

20   A.    Yes.

21   Q.    And the review included deposits into that bank account?

22   A.    Yes.

23   Q.    And was there a particular deposit in November of 2018

24   that caught the attention of investigators?

25   A.    Yes.  A check from MAPFRE Insurance Company.

```
1   Q.   Okay.  I am going to have you take a look up here at
2   what's been marked as Grand Jury -- I'm sorry -- Government
3   Exhibit 2.
4            MS. BARCLAY:  And, Your Honor --
5   BY MS. BARCLAY:
6   Q.   Special Agent Elio, could you identify that document,
7   please?
8   A.   This is a check from MAPFRE Insurance Company made payable
9   to Gary DeCicco that was found in the Atlantis bank account.
10            MS. MINER:  No objection.
11            THE COURT:  Thank you.  Marked as Exhibit 2.
12            (Government Exhibit 2 received in evidence.)
13   BY MS. BARCLAY:
14   Q.   And what's the date on the check?  Can you see it from
15   there?
16   A.   11/17/18.
17   Q.   And the check is made payable to whom?
18   A.   Gary P. DeCicco.
19   Q.   And what's the amount of the check?
20   A.   $7,138.78.
21   Q.   And what in particular caught the attention of
22   investigators with respect to this check?
23   A.   We were concerned because as part of the original
24   indictment being alleged insurance fraud, we saw a claim number
25   on here which made us believe that this was an insurance claim.
```

1  Q.    Okay.  And taking a look at what's been marked as Grand

2  Jury [sic] Exhibit 3, do you recognize that as the November

3  2018 statement for the Atlantis Marina Docks, LLC account?

4  A.    Yes.

5  Q.    And, in fact, does that statement reflect a deposit of

6  that claim check into that account?

7  A.    Yes.

8          MS. MINER:  No objection.

9          THE COURT:  Marked as Exhibit 3.

10         (Government Exhibit 3 received in evidence.)

11 BY MS. BARCLAY:

12 Q.    What did investigators do when they noticed the check?

13 A.    We contacted Commerce Insurance Company.  We served

14 subpoenas on Commerce Insurance Company to get more

15 information.

16 Q.    And did you receive any information from Commerce?

17 A.    Yes.

18 Q.    Okay.  Taking a look at what's been marked as Government

19 Exhibit 4, do you recognize that document?  I am going to give

20 you a copy.

21 A.    Yes.

22 Q.    What is it?

23 A.    It's an online claim that was filed by Mr. DeCicco.

24 Q.    And it's from MAPFRE Commerce Insurance Company; is that

25 correct?

1   A.    Yes.

2   Q.    And just taking a look at -- going down here, when was the

3   claim submitted?

4           THE COURT:  Well, again --

5           MS. MINER:  No objection.

6           THE COURT:  -- no objection?  Thank you.  Exhibit 4.

7           (Government Exhibit 4 received in evidence.)

8   A.    November 13th, 2018.

9   Q.    At what time?

10  A.    12:31 p.m.

11  Q.    And during the investigation, did investigators speak to

12  representatives of Commerce?

13  A.    Yes.

14  Q.    And how was this -- according to Commerce representatives,

15  how was this claim submitted?

16  A.    According to Commerce reps, it was submitted online at

17  this time.

18  Q.    And the insured name, according to this claim, is what?

19  A.    Gary DeCicco.

20  Q.    And just going down, at the bottom of the first page of

21  Exhibit 4, who is reporting the claim, according to this form?

22  A.    Gary DeCicco.

23  Q.    And on the second page -- where it says "incident details"

24  in the middle of the second page, what was the time of the

25  incident, according to this form?

1    A.    11:30 a.m.

2    Q.    And where was the location of the incident?

3    A.    Revere, Massachusetts.

4    Q.    And if you could just read "Please tell us what happened,

5    include vehicle contact points."

6    A.    "Insured was driving when a noninsured pushed the insured

7    over due to a puddle and insured got pushed into a guardrail."

8    Q.    And going down to the bottom of that page, the second page

9    there, there are details regarding the vehicle.  What kind of

10   vehicle was it?

11   A.    2012 Chevy Corvette.

12   Q.    And that's the vehicle we just saw the RMV-1 for?

13   A.    Yes.

14   Q.    And turning to the third page of that document, there's a

15   description of the damage at the top, correct?

16   A.    Yes.

17   Q.    And here at the top it says, "Damage details."  What does

18   it say?

19   A.    "Right fronts corner."

20   Q.    And it says, "Is the vehicle drivable?"

21   A.    No.

22   Q.    What's the answer?

23   A.    "No."

24   Q.    And was the vehicle towed?

25   A.    Yes.

1    Q.   What's the answer?  I'm sorry?

2    A.   "Yes."

3    Q.   And down here on the middle it says, "Do you plan on

4    getting your vehicle repaired?"  How did Mr. DeCicco answer

5    that?

6    A.   "No."

7    Q.   Special Agent Elio, Mr. DeCicco is on a GPS bracelet as

8    part of his pretrial release conditions; is that accurate?

9    A.   Yes.

10   Q.   And did you review the GPS data for Mr. DeCicco for

11   November 13th, 2018?

12   A.   Yes.

13   Q.   And were there any parts of the Commerce package that was

14   sent to you that caused concern?

15   A.   Yes.

16   Q.   What was it?

17   A.   His GPS shows him on North Shore Road --

18   Q.   Not the GPS.  I'm sorry.

19          The Commerce package that came to you, aside from

20   this form, was there anything included in there that caught

21   your attention?

22   A.   The information that Commerce provided to us?

23   Q.   Yes.

24   A.   Yes.

25   Q.   What was that?

1    A.    The phone call that Mr. DeCicco made to a Commerce

2    representative.

3    Q.    And was there something submitted about a tow?

4    A.    Yes.

5    Q.    What was it?

6    A.    There was a tow invoice for $400 from Cal's Auto Body.

7    Q.    Okay.  Back to the GPS data, you said you reviewed the GPS

8    data for November 13th, 2018?

9    A.    Yes.

10   Q.    And did that data reflect where Mr. DeCicco was on

11   November 13th, 2018, at 12:31 p.m. when he submitted this form

12   online?

13   A.    Yes.

14   Q.    I'm going to put in front of you what's been marked as

15   Government's Exhibit 5 and Government's Exhibit 6.  Do you

16   recognize those?

17   A.    Yes.

18   Q.    Could you identify them, please?

19   A.    Exhibit 5 is GPS location data for Mr. DeCicco.

20   Q.    And is Exhibit 6 the same thing?

21   A.    Yes, a different time.

22            MS. BARCLAY:  Your Honor, I would offer those.

23            MS. MINER:  No objection.

24            THE COURT:  So marked Exhibits 5 and 6.

25            (Government Exhibits 5 and 6 received in evidence.)

1   BY MS. BARCLAY:

2   Q.   And this is information provided by Pretrial Services?

3   A.   Yes.

4   Q.   And who was the officer?  Was it Chrissy Murphy?

5   A.   Yes.

6   Q.   Taking a look at Government Exhibit 5 at 11/13/2018 at

7   12:13 p.m., where approximately was Mr. DeCicco according to

8   this GPS data?

9   A.   41 Argyle Street, Winthrop, Mass.

10  Q.   And what time did he leave there according to Government's

11  Exhibit 6?

12  A.   12:38.

13  Q.   And what do you know to be in the general vicinity of

14  Argyle Street?

15  A.   Cal's Auto Body.

16  Q.   And do you know the address, the exact address?

17  A.   I believe it's 8.

18  Q.   And how is Argyle Street spelled?

19  A.   A-r-g-y-l-e.

20  Q.   Just going back to Government's Exhibit 4, the claim, the

21  third page, vehicle location, according to this it's located

22  where, the car?

23  A.   Cal's Auto Body located at 8 Argyle Street.

24  Q.   Is "Argyle" spelled correctly?

25  A.   No.

1    Q.   Do you know how long Cal's Auto Body has been at 8 Argyle

2    Street?

3    A.   I know it's been since at least 2009.

4    Q.   Taking a look at what's been marked as Government Exhibit

5    7, do you recognize that?

6    A.   I do.

7    Q.   What is it?

8    A.   It's a CD.

9    Q.   And what's on the CD?

10   A.   It should be a recorded phone call between Mr. DeCicco and

11   a Commerce representative.

12   Q.   What's the date of the phone call?

13   A.   I don't -- I believe it's November 16th, 2018.

14   Q.   2018.

15        MS. BARCLAY:  Your Honor, I'd offer -- I believe we're

16   on 7, right?

17        MS. MINER:  No objection.

18        THE COURT:  So marked.

19        (Government Exhibit 7 received in evidence.)

20        MS. BARCLAY:  And I ask to play the call at this time.

21        THE COURT:  Okay.

22        (Audio playing.)

23        MS. BARCLAY:  I'm just going to pause it there.

24   BY MS. BARCLAY:

25   Q.   Special Agent Elio, do you recognize the male voice on

1    that phone -- on that call?

2    A.    Yes.

3    Q.    Who is it?

4    A.    Mr. DeCicco.

5    Q.    And how do you know that?

6    A.    I've spoken with Mr. DeCicco.

7    Q.    And the female voice, do you know who that is?

8    A.    No.

9    Q.    But she purports to be a representative of Commerce,

10   correct?

11   A.    That's how she identifies herself, yes.

12             (Audio playing.)

13   BY MS. BARCLAY:

14   Q.    Special Agent Elio, around two minutes into the call, is

15   it accurate that Mr. DeCicco states that the car was not

16   drivable, the tire was flat, and the rim was cracked in half?

17   A.    Yes.

18   Q.    And about two minutes and 45 seconds into the call he says

19   the damage is all on the right side.  "I didn't look at it.

20   They towed it."  Is that correct?

21   A.    Yes.

22   Q.    Could you identify Government Exhibit 8, please?

23   A.    This is a tow invoice we received from Cal's Auto Body.

24   Q.    And from where did you receive that?

25   A.    I believe we received it from Commerce Insurance Company

1    and from Cal's Auto Body.

2    Q.    They look the same?

3    A.    Yes.

4    Q.    So it's a towing report from -- it says Winthrop Collision

5    Center and Towing on the top here, but then it has Cal's Auto

6    Body, 8 Argyle Street, correct?

7    A.    Yes.

8    Q.    And for the person towed, it has Mr. DeCicco's name,

9    correct?

10   A.    Yes.

11   Q.    And it has a 2012 Chevy Corvette, black, same car,

12   correct?

13   A.    Yes.

14   Q.    And here -- where was it towed from, according to this

15   document?

16           THE COURT:  Let me just confirm this.

17           MS. MINER:  It's no objection.  I'm sorry.

18           MS. BARCLAY:  I'm sorry, Your Honor.

19           THE COURT:  Marked as Exhibit 8.

20           (Government Exhibit 8 received in evidence.)

21   A.    It's towed from North Shore Road, Revere, Mass.

22   Q.    And where was it towed to?

23   A.    Cal's Auto Body, 8 Argyle Street, Winthrop.

24   Q.    And what's the total amount for this tow, according to

25   this slip?

1    A.    $400.

2    Q.    And that's made up of a number of different charges,

3    correct?

4    A.    Yes.

5    Q.    So the towing charge is $100 and then there is a road

6    service charge for $100, a second man charge for $100, and a

7    cleanup and dolly speedy dry for $100; is that right?

8    A.    Yes.

9    Q.    So not just the standard tow.  There's also some cleanup

10   involved and a second person, according to this, correct?

11   A.    According to this invoice, yes.

12   Q.    Okay.  Special Agent Elio, could you identify Government's

13   Exhibit 9, please.

14   A.    This is a check payable to -- actually, three different

15   checks from the Commerce Insurance claim.  One to --

16          MS. BARCLAY:  First, I'd like to offer it.

17          MS. MINER:  No objection.

18          THE COURT:  Marked as Exhibit 9.

19          (Government Exhibit 9 received in evidence.)

20   BY MS. BARCLAY:

21   Q.    Go ahead, Special Agent Elio.

22   A.    The first page of the exhibit is a $400 check payable to

23   Cal's Auto Body.  The second check is a $7,138.78 check payable

24   to Mr. DeCicco.

25   Q.    And that's the check -- we saw a different version of that

1  check deposited into the Atlantis Marina account, correct?

2  A.    Yes.

3  Q.    Okay.  And I'm sorry.  Go ahead.

4  A.    And the third check is a $501.39 check to Enterprise

5  Rent-a-Car.

6  Q.    And these are checks that Commerce paid out on the claim

7  filed by Mr. DeCicco, is that correct, related to the 2012

8  Corvette?

9  A.    According to Commerce, yes.

10  Q.    Are you familiar with Cal's Auto Body?

11  A.    Yes.

12  Q.    Who owns it?

13  A.    Charlie Lightbody.

14  Q.    And what's the relationship between Mr. Lightbody and

15  Mr. DeCicco, if you know, or what has it been over the years?

16  A.    They were business partners, business associates, friends.

17  Mr. Lightbody contributed to Mr. DeCicco's canteen while he was

18  in prison.  So they've known each other for a number of years.

19  Q.    And did investigators continue to look into the validity

20  of the Corvette claim?

21  A.    Yes.

22  Q.    What did they do -- what did you do next?

23  A.    We went to Cal's Auto Body.

24  Q.    Did you bring anything with you to Cal's?

25  A.    A subpoena.

1    Q.    And do you remember when that was?

2    A.    Early 2019.

3    Q.    Was it towards the middle to end of January?

4    A.    It sounds about right, yes.

5    Q.    And who did you speak to, if anyone, at Cal's?

6    A.    Joseph Matarese.

7    Q.    Who is he?

8    A.    He's the manager of Cal's Auto Body.

9    Q.    Did Mr. Matarese or Cal -- did you speak to anyone else

10   while you were there?

11   A.    No.

12   Q.    Did Mr. Matarese provide any documents?

13   A.    Yes.

14   Q.    Was this tow slip, Exhibit 9 -- Exhibit 8, was a copy of

15   this included in the exhibits he provided?

16   A.    Yes.

17   Q.    And did the subpoena request anything other than

18   documents?

19   A.    Yes.

20   Q.    What did it request?

21   A.    The identity of the individual who had towed the vehicle.

22   Q.    Did Mr. Matarese provide that information?

23   A.    No.  He said he was going to get back to us with regards

24   to that.

25   Q.    And what, if anything, did Mr. Matarese say about this

1    incident?

2    A.   He said that either he or Mr. Lightbody received a phone

3    call from Mr. DeCicco telling him he had been involved in the

4    accident and he needed the car to be towed.  So Mr. Matarese

5    couldn't recall whether Mr. Lightbody or him or someone else

6    went to tow it.  He was going to find out who it was.  He said

7    the vehicle was still at the shop and that Mr. DeCicco had

8    received payment from the insurance company but they had not

9    received any payment, and they were not going to fix it because

10   at the time Mr. DeCicco was trying to get a loan or borrow

11   money from Mr. Lightbody.

12   Q.   And when you left, did you ask Mr. Matarese to provide any

13   other information?

14   A.   Just the information with respect to who towed the

15   vehicle.

16   Q.   Name of the tow driver?

17   A.   The name of the tow driver.

18   Q.   After you went to Cal's Auto Body, did the shop or anyone

19   on the shop's behalf make any contact with investigators?

20   A.   A lawyer on behalf of the shop.

21   Q.   Who was that?

22   A.   Tim Flaherty.

23   Q.   And who did he call?

24   A.   He contacted Agent Lemanski.

25   Q.   And what did he say?

1   A.   He said that the vehicle actually wasn't towed.  It was a

2   mistake, an honest mistake by Cal's.  The vehicle was driven to

3   the shop, and this was a mistake.

4   Q.   And was there any other contact with Commerce?

5   A.   Yes.

6   Q.   What was that?

7   A.   Commerce followed up shortly after Mr. Flaherty's phone

8   call and said that they were contacted by Cal's Auto Body and

9   informed that this was -- this invoice was a mistake and that

10  they were -- they got reimbursed for the $400.  Cal's Auto Body

11  sent a $400 check to Commerce Insurance Company.

12  Q.   So the incident with the Corvette accident, that started

13  with the deposit of a check into the Atlantis Marina account.

14  Were there any other deposits around that same time that raised

15  concerns for investigators?  I'm sorry.  Any other

16  transactions?

17  A.   I don't know if there was a deposit.  There was a

18  transaction.

19  Q.   Yes, a transaction.

20  A.   There was a bank check payable, I believe, shortly after

21  this accident in late November, possibly November 28th of '18,

22  for $6,100 for Deals on Wheelz.

23  Q.   And I'm sorry.  Deals on Wheelz with a Z?

24  A.   With a Z, yes.

25  Q.   Could you identify what's marked as Government Exhibit 10?

1    A.    This is the general ledger from Mr. DeCicco's -- or from

2    the Atlantis Marina bank account showing the $15 fee, and then

3    on Page 2 is the $6,100 bank check paid to Deals on Wheelz, and

4    then the debit slip is the fourth page.

5              MS. BARCLAY:  Your Honor, I offer Exhibit 10.

6              MS. MINER:  No objection.

7              THE COURT:  So marked.

8              (Government Exhibit 10 received in evidence.)

9    BY MS. BARCLAY:

10   Q.    And, again, on the second page of this document, Exhibit

11   10, Bank of America, this is a cashier's check; is that right?

12   A.    Yes.

13   Q.    And it's to the order of Deals on Wheelz?

14   A.    Yes.

15   Q.    And it's for $6,100, correct?

16   A.    Yes.

17   Q.    And according to this record on Page 3, who purchased this

18   check?

19   A.    It appears to be the customer's signature, Pamela

20   Avedisian.

21   Q.    Okay.  Were investigators able to determine what that

22   check was for?

23   A.    Yes.

24   Q.    How were you able to determine that?

25   A.    We contacted Deals on Wheelz, and we learned that it was

1    for the purchase of a Cadillac.

2    Q.   Taking a look at what's been marked as Government Exhibit

3    11, do you recognize this?

4    A.   Yes.

5    Q.   And could you describe that, please.

6    A.   It's a RMV-1 for a 2011 Cadillac CTS.  Owner's name, Gary

7    P. DeCicco.

8            MS. BARCLAY:  Your Honor, I offer Exhibit 11.

9            MS. MINER:  No objection.

10           THE COURT:  So marked.

11           (Government Exhibit 11 received in evidence.)

12   BY MS. BARCLAY:

13   Q.   Taking a look at that document at the top here, you said

14   it was a 2011 Cadillac CTS sedan.  Owner, Gary DeCicco.  What's

15   the date of purchase?

16   A.   11/28/18.

17   Q.   And for how much was it purchased?

18   A.   $6,100.

19   Q.   And it appears to be signed by Mr. DeCicco; is that

20   accurate?

21   A.   It appears to be.

22   Q.   And the purchase was for $6,100, right?

23   A.   Yes.

24   Q.   So more than $1,000?

25   A.   Yes.

1    Q.    Special Agent Elio, during the investigation did

2    investigators -- or did the grand jury subpoena records for

3    Mr. DeCicco's mobile phone for November of 2013?

4    A.    '18.

5    Q.    I'm sorry.  2018?

6    A.    Yes.

7    Q.    And did the investigators review those records?

8    A.    Yes.

9    Q.    Were there any calls in Mr. DeCicco's mobile phone records

10   for just the month of November of '18 with Ms. Avedisian's

11   attorney, Frank DiMento?

12   A.    Yes.

13   Q.    More than one?

14   A.    A significant amount of contacts, yes.

15   Q.    Okay.  And Mr. DeCicco and Ms. Avedisian have a daughter

16   together; is that right?

17   A.    Yes.

18   Q.    And based on your investigation, how old is that daughter?

19   A.    I believe she's 20.

20   Q.    Special Agent Elio, the investigation leading to the first

21   superseding indictment in January of 2019, did that involve

22   investigation into Thayer Avenue, a property in Revere?

23   A.    Yes.

24   Q.    And, among other things, did you interview partners in

25   that property?

1    A.    Yes.

2    Q.    What was the name of the partner that you interviewed?

3    A.    Joel DeLuca.

4    Q.    Did investigators also review records related to that

5    property?

6    A.    Yes.

7    Q.    And what did the investigation reveal about the ownership

8    of Thayer Avenue, let's say, before January 2019?

9    A.    My understanding from Mr. DeLuca is that at one point

10   Mr. DeCicco approached Mr. DeLuca or Mr. DeLuca's father to

11   become a 50-percent partner in Thayer Avenue, and so they had

12   negotiations and discussions with respect to that.  And they

13   moved forward and became 50 percent partner with Mr. DeCicco.

14   And then they tried to develop it into, you know, condominiums

15   and then potentially a 40B, and then Mr. DeCicco was

16   incarcerated and then Mr. DeLuca wanted to sell his interest.

17   Q.    And you say that according to the DeLucas, Mr. DeCicco was

18   a partner.  Is Mr. DeCicco a partner on paper in that property?

19   A.    I believe he was previous to the DeLucas becoming

20   partners, and then when the DeLucas became partners,

21   Ms. Avedisian became the on-paper partner with the DeLucas.

22   Q.    Taking a look at Government Exhibit 12, can you identify

23   that document, please?

24   A.    It's a contract between Pamela Avedisian, and Anthony and

25   Joel DeLuca.

1          MS. BARCLAY:  Your Honor, I would offer Government's

2     Exhibit 12.

3          MS. MINER:  No objection.

4          THE COURT:  So marked.

5          (Government Exhibit 12 received in evidence.)

6     BY MS. BARCLAY:

7     Q.   And -- so this is a contract.  And what's the date of the

8     contract?

9     A.   July 31st, 2012.

10    Q.   And it's between Pamela Avedisian and Anthony and Joel

11    DeLuca, according to this document, correct?

12    A.   Yes.

13    Q.   Could you identify Government's Exhibit 13, please?

14    A.   This is a guarantee whereby Mr. DeCicco guarantees all

15    obligations of Pam Avedisian under the contract -- under this

16    contract, July 31, 2012.

17         MS. MINER:  No objection.

18         THE COURT:  So marked.

19         MS. BARCLAY:  Thank you.

20         (Government Exhibit 13 received in evidence.)

21    BY MS. BARCLAY:

22    Q.   And did Mr. DeLuca tell you why they had this document or

23    why this document exists?

24    A.   Yes.  His lawyer was concerned because Mr. DeLuca was

25    under the impression that Mr. DeCicco was the owner, and he had

1    all his conversations and the negotiation was with Mr. DeCicco.

2    And they believed that Mr. DeCicco had assets and Ms. Avedisian

3    did not, so they wanted Mr. DeCicco to guarantee all

4    obligations on behalf of Ms. Avedisian.  So this was at the

5    direction of the DeLucas' lawyer.

6    Q.   And do the DeLucas still own the property; do you know?

7    A.   I believe they do not.

8    Q.   And -- but did they own it as of maybe January of 2019?

9    A.   Yes.

10   Q.   And from the time that they put their money into the

11   property in 2012 until 2019, who did they deal with with

12   regards to the property?

13   A.   Mr. DeCicco.

14   Q.   Did they ever deal with Ms. Avedisian?

15   A.   Only to sign paperwork.

16   Q.   And did they deal with her when Mr. DeCicco was in prison?

17   A.   Yes.

18   Q.   Could you identify Government's Exhibit 14, please?

19   A.   This is an acknowledgment of payment dated July 31st,

20   2012, of $50,000.

21              MS. MINER:  No objection.

22              THE COURT:  Thank you.

23              (Government Exhibit 14 received in evidence.)

24   Q.   And did Mr. DeLuca explain how this document came about?

25   A.   Yes.

1    Q.    How or what did he say?

2    A.    According to Mr. DeLuca, Mr. DeCicco -- I believe this

3    contract was structured in a way where X amount was paid up

4    front and additional money was going to be paid when permits

5    were secured.  So Mr. DeCicco was looking for $150,000 and the

6    DeLucas agreed to $50,000, and this was to acknowledge that

7    payment.  And the DeLucas and Mr. DeCicco, this --

8    Ms. Avedisian's signature was executed by Mr. DeCicco in

9    Mr. DeLuca's presence.

10   Q.    And Mr. DeCicco was released from prison in around June of

11   2018; is that right?

12   A.    Yes.

13   Q.    And after his release, did -- in July of 2018, did

14   investigators or the Government learn anything about the Thayer

15   Avenue property?

16   A.    Yes.

17   Q.    What happened?

18   A.    I believe the Government was contacted by Mr. DeLuca's

19   attorney, who informed us that Mr. DeCicco had offered to

20   purchase Thayer Avenue from the DeLucas for $650,000.  So he

21   was looking to buy out Mr. DeLuca's interest.

22   Q.    Could you identify Government Exhibit 15, please?

23          (Government Exhibit 15 marked for identification.)

24   A.    It's an e-mail from Jonathan Crafts to Kristina Barclay

25   and Sandy Lemanski dated July 27th, 2018.

1    Q.    And is there an attachment to that e-mail?

2    A.    There is.

3    Q.    And who was Jonathan Crafts?

4    A.    He's one of Mr. DeLuca's attorneys.

5    Q.    And turning to Page 3, the first page of the attachment,

6    what is that?

7    A.    It's a membership interest purchase agreement.

8    Q.    And who is offering to purchase?  Who is the purchaser

9    according to this agreement?  In the first paragraph.

10   A.    Gary P. DeCicco and Pamela Avedisian.

11   Q.    And what's the purchase price, according to Paragraph 2 on

12   the first page?

13   A.    $650,000.

14   Q.    And did anything come of this?

15   A.    No.

16   Q.    In January of 2019, did Mr. DeLuca provide additional

17   information about Thayer Avenue and the status of Thayer Avenue

18   to investigators?

19   A.    Yes.

20   Q.    What did he say?

21   A.    He informed us that they found another buyer, an

22   individual by the name of Robert Fautz.  And according to

23   Mr. DeLuca, Mr. DeCicco had implied that he may have been a

24   straw for Mr. DeCicco or Mr. DeCicco may have been financially

25   backing Mr. Fautz.

```
1    Q.   And was that someone Mr. Deluca had introduced to the
2    deal?
3    A.   No.
4    Q.   And did you look into -- or did investigators look into
5    Mr. Fautz's background?
6    A.   Yes.
7    Q.   And did what you find raise any concerns?
8    A.   Yes.
9    Q.   Why?
10   A.   He had a conviction on an FBI case in Miami, and he had
11   also filed bankruptcy.
12   Q.   And did you and Special Agent Lemanski ultimately
13   interview Mr. Fautz?
14   A.   Yes.
15   Q.   When was that?
16   A.   I believe it was February 12th, 2019.
17   Q.   And as far as you know, was that the first time the
18   Government contacted Mr. Fautz about Thayer Avenue?
19   A.   Yes.
20   Q.   And after the interview, the Government ultimately
21   consented to the sale of the property to Mr. Fautz; is that
22   right?
23   A.   Yes.
24   Q.   What, if anything, did Mr. Fautz tell you about how he
25   found the property?
```

1    A.    When he moved back to the Boston area approximately two

2    years ago, he was working on a lobster boat and he had gone by

3    Thayer Ave. marina, and he was interested in it.  He had said

4    that he had been involved in real estate development, and he's

5    always been interested in real estate.  So he researched on the

6    Secretary of State database to find out who owned the property.

7    He learned that Mr. DeCicco and Ms. Avedisian, Mr. DeLuca owned

8    the property, so he inquired.

9          He had met Charlie Lightbody on a prior real estate

10   deal, so he asked Mr. Lightbody if he could connect him with

11   Mr. DeCicco.  And when Mr. DeCicco was released from prison,

12   Mr. Lightbody connected Mr. Fautz with Mr. DeCicco.

13   Q.    And did Mr. Fautz say -- did you ask him who was involved

14   in the deal, who negotiated the deal?

15   A.    The current deal that he had?

16   Q.    Yes.

17   A.    It was with Mr. DeCicco.

18   Q.    And was Mister -- was Ms. Avedisian involved in the deal

19   at all?

20   A.    No.

21   Q.    Had Mr. Fautz ever met Ms. Avedisian?

22   A.    Yes.

23   Q.    How many times?

24   A.    At least once.

25   Q.    Did he say why he met her or how he met her?

1    A.    He knew her name was on paper, but he actually questioned

2    whether she existed so he had asked Mr. DeCicco to take him to

3    the house to meet her.

4    Q.    And did Mr. DeCicco do that?

5    A.    Yes.

6    Q.    And according to Mr. Fautz, who was at the house together?

7    A.    Mr. DeCicco, Ms. Avedisian, Mr. Fautz, and I believe

8    Mr. DeCicco's daughter.

9    Q.    And were there any lawyers present?

10   A.    Not according to Mr. Fautz.

11   Q.    And according to Mr. Fautz, did Mr. DeCicco appear to have

12   other contact with Ms. Avedisian while Mr. Fautz was present?

13   A.    Yes.

14   Q.    How did that come about?

15   A.    Mr. DeCicco would contact his daughter on the telephone

16   and ask to have Pam, Ms. Avedisian, put on the phone.

17   Q.    And Mr. Fautz said he observed them talking -- or he

18   observed Mr. DeCicco apparently talking to Ms. Avedisian?

19   A.    Yes.  What he said, appeared to be talking with her on

20   more than one occasion.

21   Q.    Did Mr. Fautz say anything else about his dealings with

22   Mr. DeCicco that caused concern for investigators?

23   A.    Yes.

24   Q.    What were they?

25   A.    Mr. DeCicco asked Mr. Fautz for $100,000 under the table

```
 1   to pay for an individual named Weinberg.  He had also asked him
 2   to sign a consulting agreement so he could consult on the
 3   property.
 4   Q.   Did Mr. Fautz in fact tell Mr. DeCicco that he was not
 5   going to enter into a consulting agreement?
 6   A.   Yes.
 7   Q.   And what, if anything, did Mr. Fautz tell you
 8   Mr. DeCicco's response was?
 9   A.   According to Mr. Fautz, actually the day before we had
10   interviewed him, he thought we were coming to him because of
11   what had transpired the day before on February 11th when
12   Mr. DeCicco informed him that he would get me -- you know,
13   you'll get me that money one way or another, according to
14   Mr. Fautz.
15           MS. BARCLAY:  If I could just have one second, Your
16   Honor?
17           THE COURT:  Yes.
18           (Pause.)
19           MS. BARCLAY:  Nothing further from the Government.
20                       CROSS-EXAMINATION
21   BY MS. MINER:
22   Q.   Let's go back to the beginning, Mr. Elio.  You said that
23   you were involved in this case, correct?
24   A.   Yes.
25   Q.   You were also involved in Mr. DeCicco's prior case, were
```

1   you not?

2   A.   Yes.

3   Q.   And you were aware that he was acquitted in that case,

4   right?

5   A.   Yes.

6   Q.   You were one of the investigating agents in that case,

7   were you not?

8   A.   Yes.

9   Q.   And you were aware that he was held in pretrial detention

10  in that case, correct?

11  A.   Yes.

12  Q.   And did you testify in that detention hearing?

13  A.   No.

14  Q.   Now, you testified about a 2012 Corvette.  Do you remember

15  that?

16  A.   Yes.

17  Q.   And you were shown Exhibit 1, correct, which is the RMV?

18  A.   Yes.

19  Q.   And Ms. Barclay asked you if it showed a total sale price

20  of $20,000.  Do you recall that?

21  A.   Yes.

22  Q.   This document does not say when that $20,000 was paid,

23  does it?

24  A.   Well, it says date of purchase, August 17th, 2018.

25  Q.   It says the date of purchase, but it doesn't say when the

1  money was transferred, does it?

2  A.   No.  But based on this, it says total sale price and date

3  of purchase, one would -- you know, I'd come to the conclusion

4  that that's the date the vehicle was purchased.

5  Q.   You came to that conclusion, right?

6  A.   I would, yes.

7  Q.   But nobody told you when it was?

8  A.   Well, Mr. Carroll said it was back in 2016.

9  Q.   Correct.

10  A.   Yes.

11  Q.   And Mr. Carroll said he didn't get any money from

12  Mr. DeCicco in 2018, didn't he?

13  A.   Correct.

14  Q.   And Mr. Carroll said that he was the one that filled out

15  this form; isn't that right?

16  A.   Yes.

17  Q.   And Mr. Carroll also told you that he paid the sales tax

18  for Mr. DeCicco; isn't that right?

19  A.   According to Mr. Carroll, yes.

20  Q.   And Mr. Carroll explained that this was just his way of

21  transferring the Corvette from Lynnway Auto to Mr. DeCicco,

22  correct?  He was helping Mr. Aswad out, correct?

23  A.   He was helping Mr. Aswad, yes.

24  Q.   Aswad, I'm sorry.

25  A.   That's okay.

1   Q.   That's what Mr. Carroll told you, correct?

2   A.   Yes.

3   Q.   And that was confirmed by Mr. Aswad, right?

4   A.   Yes.  Mr. Aswad, yes.

5   Q.   And Mr. Aswad told you that he was told by a mechanic,

6   Mr. Hanson, that Mr. DeCicco wanted his Corvette back, correct?

7   A.   Yes.

8   Q.   And did you interview Mr. Hanson?

9   A.   We did not.

10   Q.   So you don't know who asked Mr. Hanson to reach out to

11   Mr. Aswad, do you?

12   A.   We know what Mr. Aswad told us, which is that Mr. Hanson

13   spoke with Mr. DeCicco, and he wanted the Corvette back.

14   Q.   And so Mr. Aswad said that Mr. Hanson told him that or

15   that's what he just assumed?

16   A.   That's what he said, yes.

17   Q.   Now, Mr. DeCicco was in an accident with the Corvette in

18   November, correct?

19   A.   Yes.

20   Q.   And he received approximately $7,100 for the damage to his

21   car, correct?

22   A.   According to Commerce, yes.

23   Q.   And you actually subpoenaed Commerce, correct?

24   A.   Yes.

25   Q.   And Commerce, among other things, gave you pictures of the

1   car, correct?

2   A.   Yes.

3        MS. MINER:   Do you want this to be the next in number

4   or do you want to start over?

5        THE COURT:   I think that makes the most sense.

6        MS. MINER:   That makes sense if I knew what the number

7   was.

8        MS. BARCLAY:   16.

9        THE COURT:   16.

10       (Defendant Exhibit 16 received in evidence.)

11  BY MS. MINER:

12  Q.   And I place this before you, Exhibit 16.

13       MS. MINER:   Do you have a pen?   Mine aren't premarked.

14       THE COURT:   Mr. Quinn has stickers.

15  BY MS. MINER:

16  Q.   So it's your -- and do you recognize those documents as

17  coming from Commerce Insurance?

18  A.   I do, yes.

19  Q.   In response to your subpoena?

20  A.   Yes.

21  Q.   So there is no question that the car was damaged; isn't

22  that right?

23  A.   Yes.

24  Q.   And the insurance company went out to Cal's Auto Body and

25  took pictures, right?

1    A.    According to the records from Commerce, yes.

2    Q.    You don't have any reason to dispute that, do you?

3    A.    No.

4    Q.    Now, part of the other documents that Commerce produced

5    was a claim form, correct?

6    A.    Yes.

7    Q.    That's Exhibit 4, correct?

8    A.    Yes.

9    Q.    And that came from Commerce, correct?

10   A.    Yes.

11   Q.    And you testified this was submitted electronically,

12   right?

13   A.    According to what Commerce told us, yes.

14   Q.    And you don't know who electronically submitted this form,

15   do you?

16   A.    According to this, it appears as Mr. DeCicco.  It says --

17   Q.    But you don't know who actually entered into -- the data

18   into this, do you?

19   A.    No.  I wasn't there.

20   Q.    Fair to say anybody could enter electronic data on behalf

21   of Mr. DeCicco, correct?

22   A.    Yes.

23   Q.    Including Cal's Auto Body, right?

24   A.    Yes.

25   Q.    Now, two days later after the accident, Commerce Insurance

1    Company called Mr. DeCicco, correct?

2    A.   I don't recall if it was two or three days.  I thought the

3    call might have been on the 16th.

4    Q.   Fair enough.  But it's Exhibit 7, right?

5    A.   Yes.

6    Q.   We've listened to that today, correct?

7    A.   Yes.

8    Q.   No doubt that Commerce was calling Mr. DeCicco, right?

9    A.   Yes.

10   Q.   It wasn't Mr. DeCicco calling in a claim?

11   A.   No.

12   Q.   And, you know, the Commerce employee asked how Mr. DeCicco

13   was doing, correct?

14   A.   Yes.

15   Q.   And he said he had a sore knee, but he was going to be

16   okay, right?

17   A.   Yes.

18   Q.   And the insurance lady said, well, you know, if it gets

19   worse let me know, right?

20   A.   Yes.

21   Q.   And Mr. DeCicco never put in any claim for any bodily

22   injury; isn't that right?

23   A.   We're not aware of one being made.

24   Q.   Now, he did -- Mr. DeCicco was asked about the damage to

25   the car, right?

1    A.    Yes.

2    Q.    And he starts by talking about, well, there's damage to

3    the right side of the car.  And then he's asked a more specific

4    question, and he says he didn't look too closely, right?

5    A.    I believe that's what he said.

6    Q.    And that's when he said the car was towed to Winthrop,

7    right?

8    A.    Yes.

9    Q.    Mr. DeCicco wasn't making a claim for the towing in that

10   call, was he?

11   A.    Not on that call, no.

12   Q.    In fact, Cal's Auto Body submitted a claim for the tow;

13   isn't that right?

14   A.    Yes.

15   Q.    And that was Exhibit 8.  You have it, right?

16   A.    Yes.

17   Q.    And Cal's Auto Body actually produced a copy of Exhibit 8

18   to you, right?

19   A.    Yes.

20   Q.    And later Cal's Auto Body told you that they had submitted

21   it in error, correct?

22   A.    A lawyer on behalf of Cal's.

23   Q.    Fair enough.  A representative of Cal's, right?

24   A.    Yes.

25   Q.    Said that Cal's had submitted it in error.  It was just a

1    mistake, right?

2    A.    According to the lawyer, yes.

3    Q.    And the lawyer also called Commerce, right?

4    A.    Yes.  I'm not sure if the lawyer called, but Commerce

5    informed us that they received reimbursement for it.  I don't

6    know who called Commerce.

7    Q.    Did Commerce tell you that somebody on behalf of Cal's

8    also called them and said it was a mistake?

9    A.    Yes.  I'm not sure who.

10   Q.    And that the money was returned to Cal's, right?

11   A.    The money was returned to Commerce, not Cal's.

12   Q.    Excuse me.

13   A.    That's okay.

14   Q.    Long day.

15         Now, Cal's also told you that they expected the

16   $7,100 to come to them, didn't they?

17   A.    Yes.

18   Q.    But it went to Mr. DeCicco instead, correct?

19   A.    Yes.

20   Q.    Now, you said that Mr. DeCicco and Mr. Lightbody had a

21   long relationship, right?

22   A.    I wouldn't say -- I don't know how long it was, but I know

23   they had a personal and business relationship.

24   Q.    You're not suggesting that they're currently friends, are

25   you?

1    A.    I have no idea if they're currently friends.

2    Q.    Fair enough.  You know that Cal's wouldn't start repairing

3    the car until they got the money, right?

4    A.    Yes.  Because Mr. DeCicco had asked to borrow money from

5    Mr. Lightbody, so -- according to Mr. Matarese.

6    Q.    And according to your interviews, Mr. Lightbody didn't

7    lend Mr. DeCicco any money, correct?

8    A.    We never interviewed Mr. Lightbody.

9    Q.    Well, who told you that Mr. DeCicco was looking to borrow

10   money from Mr. Lightbody?

11   A.    Mr. Matarese.

12   Q.    So not directly from Mr. Lightbody?

13   A.    No.

14   Q.    So Mr. Matarese, did he say who told him that?

15   A.    No.

16   Q.    Now, you also talked about Mr. DeCicco buying a Cadillac

17   for $6,100, correct?

18   A.    Yes.

19   Q.    And you interviewed the seller of the Cadillac, fair

20   enough?

21   A.    I did not.  Agent Lemanski did.

22   Q.    But are you familiar with the reports?

23   A.    Yes.

24   Q.    And fair to say that Mr. DeCicco talked to the seller of

25   the car, right?

1    A.    I believe so.

2    Q.    And the seller said he was talking about buying a car on

3    behalf of his daughter, correct?

4    A.    Yes.

5    Q.    But Mr. DeCicco had the car put in his own name, correct?

6    A.    According to the RMV-1, yes.

7    Q.    Now, with respect to Thayer Avenue, you testified that you

8    believed that Mr. DeCicco owned it before Ms. Avedisian became

9    a partner in the LLC which eventually owned it?

10   A.    On paper, yes, I believe that's --

11   Q.    Do you have any documents that show that?

12   A.    I'm sure we do.  I don't recall which one right now.

13   Q.    Do you have the title to the property?

14   A.    I believe there's a deed that we had used in the original

15   indictment.  However, I have not seen it recently so I can't

16   speak to that.

17   Q.    Okay.  But in any event, at least in 2016 it was owned by

18   a partnership of Ms. Avedisian and the DeLucas, correct?

19   A.    Yes.

20   Q.    And when -- in 2012 the DeLucas became partners with

21   Ms. Avedisian.  Mr. DeCicco guaranteed her obligations,

22   correct?

23   A.    Yes.

24   Q.    That's Exhibit 13, correct?

25   A.    Yes.

1    Q.    And, again, that was in 2012, correct?

2    A.    July 31st, 2012, yes.

3    Q.    And in November of 2016, you testified that the DeLucas

4    gave Ms. Avedisian $50,000 towards that property, correct?

5              THE COURT:  Can you say that again, please?

6              MS. MINER:  I'm referring to Exhibit 14.

7              MS. BARCLAY:  I am going to object, Your Honor.  I

8    don't think that's what --

9    BY MS. MINER:

10   Q.    Let's look at Exhibit 14.

11   A.    Yes.

12   Q.    This is an acknowledgment of payment by the DeLucas,

13   correct -- or at least by Joel DeLuca?  Sorry.

14   A.    Yes.

15   Q.    To Thayer Avenue Development, LLC, correct?

16   A.    Yes.

17   Q.    And at that time Thayer Avenue Development, LLC was owned

18   by Ms. Avedisian, right?

19   A.    Yes.  And I believe -- were the DeLucas a part of that, I

20   believe, as well, at that time?

21   Q.    At some point.

22   A.    Yes, of that LLC.

23   Q.    Now --

24             THE COURT:  I'm sorry.  Is that a statement or a

25   question?

```
 1              THE WITNESS:  I don't recall.  I apologize, Your
 2    Honor.  I don't recall if whether at this point the DeLucas
 3    were part of that LLC or not.
 4    BY MS. MINER:
 5    Q.   Now, fast-forwarding to 2018, at some point you learned
 6    that Mr. DeLuca wanted to sell his interest in the partnership,
 7    correct?
 8    A.   Yes.
 9    Q.   And you learned that as early as February 6th, 2018,
10    correct?
11    A.   I don't recall when we learned it.
12    Q.   Let me show you a document and see if --
13              MS. MINER:  Do we have more copies of that?  I think
14    we do.
15    BY MS. MINER:
16    Q.   I am showing what has been marked as Exhibit 17.
17              THE COURT:  No objection?  Ms. Barclay, is there any
18    objection?
19              MS. BARCLAY:  No objection, Your Honor.
20              THE COURT:  Marked as Exhibit 17.
21              (Defendant Exhibit 17 received in evidence.)
22    Q.   And this is an e-mail from Jonathan Crafts to Sandra
23    Lemanski, correct?
24    A.   Yes.
25    Q.   And it's informing Sandra -- by "Sandra," the
```

```
 1   Government -- that Mr. DeLuca would like to sell his interest
 2   in the Thayer Avenue property, correct?
 3   A.   According to this e-mail, yes.
 4   Q.   And so starting in February of 2018, the Government
 5   started conversations with Mr. DeLuca's lawyers about the
 6   transfer, correct?
 7   A.   I'm not aware.  I'm not going -- no, not to my knowledge.
 8   I don't recall them having conversations.  I remember hearing
 9   about it, and that's about all I remember.
10   Q.   Do you recall that there were e-mail transfers -- e-mails
11   back and forth about it?
12   A.   At this time?  In February of 2018?  I don't recall.
13        MS. MINER:  Could I have this marked as number 18.
14   Q.   I am showing you what I have marked as Exhibit 18.
15        MS. MINER:  And I'd offer it.
16        MS. BARCLAY:  No objection.
17        THE COURT:  So marked.
18        (Defendant Exhibit 18 received in evidence.)
19   Q.   And directing your attention to the bottom e-mail, this is
20   an e-mail between Kristina Barclay, correct?
21   A.   Yes.
22   Q.   And Mr. Crafts, Jonathan Crafts, who represented DeLuca at
23   the time, correct?
24   A.   Yes.
25   Q.   And it says, "Jonathan, if you want to reach out to
```

1    lawyers for Pam and Gary to discuss" -- "to start the

2    discussion regarding disposal of the two properties, and also

3    just let them know you've talked to us, that works for us,"

4    right?

5    A.    That's what this email says, yep.

6    Q.    Yep.  And then Ms. Barclay sets up a conference call for

7    later that week, right, if you look at the top email?

8    A.    Yes.

9              THE COURT:  Do I have 17?

10             THE CLERK:  No, you don't.

11             THE COURT:  I don't have 17.

12             MS. MINER:  Oh.  I'm sorry.

13             THE COURT:  Any objection to 18?

14             MS. BARCLAY:  No, Your Honor.

15             THE COURT:  Okay.  Marked.

16   BY MS. MINER:

17   Q.    Now, ultimately you're aware that the Government consented

18   to the sale of Mr. DeLuca's interest in the property to

19   Mr. Fautz, correct?

20   A.    Yes.

21   Q.    And you testified that Mr. DeLuca told you that

22   Mr. DeCicco told him that Mr. Fautz was just a straw?

23   A.    Not that he told him.  That Mr. DeCicco implied.

24   Q.    Oh.  So this was Mr. DeLuca's assumption?

25   A.    Yes.

1    Q.    Not based upon what was said; is that right?

2    A.    It's what he -- like I said earlier, I think Mr. DeLuca

3    said he, Mr. DeCicco, implied that Mr. Fautz was a straw.

4    Q.    That turned out not to be true, right?

5    A.    Correct.

6    Q.    In fact, the Government consented to the sale, right?

7    A.    Yes.

8    Q.    And you wouldn't have consented if Mr. Fautz was just a

9    straw for Mr. DeCicco, would you?

10   A.    No.

11   Q.    And you also testified that Mr. Fautz told you that the

12   deal came about because he was the one that researched the

13   properties in the area, right?

14   A.    According to Mr. Fautz, yes.

15   Q.    According to Mr. Fautz, Mr. DeCicco didn't reach out to

16   him, right?

17   A.    Correct.

18   Q.    It was the other way around, right?

19   A.    Yes.

20   Q.    And you've testified that you looked at phone records of

21   Mr. DeCicco, correct?

22   A.    Yes.

23   Q.    And you said that there were numerous calls to

24   Mr. DiMento, right?

25   A.    To his office, yes, office phone number.

1   Q.   And you know that Mr. DiMento represents Ms. Avedisian,

2   right?

3   A.   Yes.

4   Q.   Now, you testified that Mr. Fautz told you that he met Pam

5   on at least one occasion, right?

6   A.   Yes.

7   Q.   And that was when he asked Mr. DeCicco to take him to meet

8   her, right?

9   A.   Yes.

10   Q.   So then, again, that was at Mr. Fautz's request, right?

11   A.   Yes.

12   Q.   He initiated that contact, right?

13   A.   Yes.

14   Q.   Did he tell you how long he was at Ms. Avedisian's home?

15   A.   I don't recall him saying how long it was.

16   Q.   The purpose was just an introduction, right?

17   A.   I think I said earlier Mr. Fautz wanted to know if

18   Ms. Avedisian existed.

19   Q.   Exactly.  So he's there.  He finds out she exists, right?

20   Mission accomplished, right?

21   A.   I can't speak for Mr. Fautz with respect to that.

22   Q.   Now, you testified that Mr. Fautz told you that

23   Mr. DeCicco also asked for a consulting contract in connection

24   with the sale, correct?

25   A.   Contract or fee, yes.

1    Q.   So did he tell you that there was going to be a document

2    drafted?

3    A.   I believe Mr. Fautz said that Mr. DeCicco's lawyer was

4    going to prepare a document, yes.

5    Q.   Do you know if Mr. DeCicco's lawyer ever did that?

6    A.   I don't recall seeing one.

7    Q.   In any event, you certainly have not seen any signed

8    agreement, right?

9    A.   No.

10   Q.   And Mr. Fautz is also buying Ms. Avedisian's interest in

11   the property, correct?

12   A.   I believe so.

13   Q.   And, again, the Government has consented to that

14   transaction, right?

15   A.   Yes.

16   Q.   And do you know when that transaction is going to be

17   finalized?

18   A.   I do not.

19            MS. MINER:  I have nothing further, Your Honor.

20            THE COURT:  Anything further?

21            MS. BARCLAY:  Just two quick things, Your Honor.

22            Your Honor, may I proceed from here just so I can hand

23   the documents --

24            THE COURT:  Yes.

25            MS. BARCLAY:  -- quickly?

                    REDIRECT EXAMINATION

1

2   BY MS. BARCLAY:

3   Q.   You were asked some questions by Ms. Miner about the 2012

4   Corvette purchase --

5   A.   Yes.

6   Q.   -- do you remember those questions?

7        And I believe you were asked about Government's

8   Exhibit 1, the RMV-1 form, correct?

9   A.   Yes.

10  Q.   And Mr. Carroll said he filled it out?

11  A.   Yes.

12  Q.   But he didn't file it or sign it for Mr. DeCicco; is that

13  correct?

14  A.   No.

15  Q.   And then I think Ms. Miner asked you, and I think you said

16  that Mr. Carroll told you and Special Agent Lemanski that he

17  paid the sales tax?

18  A.   According to Mr. Carroll.

19  Q.   Okay.  And did he in fact provide you with documents of

20  purported evidence that he paid the sales tax on that?

21  A.   He provided us with the front of a check.

22  Q.   Okay.  But not the back of a check or anything like that?

23  A.   Not the back of the check.

24  Q.   And do you recognize Government's Exhibit 19?

25  A.   Yes.

1    Q.    What is that?

2    A.    This is the title.

3    Q.    Are those the documents from Mr. Carroll?

4    A.    These are the documents that Mr. Carroll provided to us

5    when we were in his office, yes.

6              MS. BARCLAY:  Your Honor, I'd offer Exhibit 19.

7              MS. MINER:  No objection.

8              THE COURT:  So marked.

9              (Government Exhibit 19 received in evidence.)

10   BY MS. BARCLAY:

11   Q.    Just flipping to the back page, is that the check that you

12   just described?

13   A.    Yes.

14   Q.    And it's in the amount of $1,250 and it's dated August 17,

15   2018, and it's payable to RMV, correct?

16   A.    Yes.

17   Q.    And it's from Boston Street Car Wash?

18   A.    Yes.

19   Q.    What is Boston Street Car Wash?

20   A.    That's a company that Mr. Carroll owns.

21   Q.    And it's signed by Mr. Carroll?

22   A.    Yes.

23   Q.    Did you ask if he had a canceled copy of this check?

24   A.    Yes.  We asked for the back.

25   Q.    And did he provide it?

```
 1    A.    No.

 2    Q.    Do you recognize what's been marked as Government's

 3    Exhibit 20?

 4    A.    Yes.

 5    Q.    What is this?

 6    A.    It's a check payable to DOT for $1,350 from the Atlantis

 7    Marina Docks, LLC dated August 23rd, 2018.

 8    Q.    And what's the amount of the check?

 9    A.    1,350, one thousand three hundred and fifty dollars.

10    Q.    And that in fact matches the amount on Government Exhibit

11    1, the Cadillac -- I mean, I'm sorry -- the Corvette RMV,

12    right?

13    A.    Yes.

14    Q.    Not the twelve-fifty?

15    A.    Yes.

16    Q.    And according to this check, this check is actually

17    deposited -- it says on the back "For deposit only to

18    Massachusetts Commonwealth, Commonwealth of Mass., Mass. DOT,

19    Wilmington," correct?

20    A.    Yes.

21    Q.    And what's the "Memo" line, the "For" line?

22    A.    2012 Corvette.

23    Q.    Okay.  And so -- and the date on that check?

24    A.    August 23rd, 2018.

25    Q.    Okay.
```

1          THE COURT:  I am going to admit this as Exhibit 20.

2          MS. MINER:  No objection, Your Honor.

3          MS. BARCLAY:  Sorry, Your Honor.

4          (Government Exhibit 20 received in evidence.)

5    BY MS. BARCLAY:

6    Q.   I'm sorry.  The Atlantis Marina Docks account, who

7    purportedly owns Atlantis Marina Docks, LLC right now or August

8    of '18?

9    A.   Pamela Avedisian.

10   Q.   In August of '18 who purportedly owned it?

11   A.   Gary DeCicco.

12   Q.   You were asked some questions about the insurance claim on

13   this vehicle, on the 2012 Corvette, and the car was damaged,

14   according to your investigation, correct?

15   A.   Based on the pictures, yeah.

16   Q.   But it wasn't towed?

17   A.   No, it wasn't towed.

18   Q.   And I think you were asked some questions about Exhibit 4,

19   the online claim form?

20   A.   Yes.

21   Q.   And according to Mr. DeCicco's GPS data, he was at Cal's

22   when it was submitted, right?

23   A.   Yes.

24   Q.   And it says it was submitted by Mr. DeCicco, right?

25   A.   It says, "Reported by," yes.

1    Q.   And Argyle Street is spelled wrong?

2    A.   Spelled wrong, yes.

3    Q.   And Mr. Matarese and Mr. Lightbody have worked at Cal's

4    for how long?

5    A.   A long time.

6    Q.   And how long has Cal's been located at Argyle?

7    A.   I believe since at least 2009.

8    Q.   And in the phone call, Ms. Miner referenced and we talked

9    about -- I believe it's Exhibit 7 -- Mr. DeCicco clearly says

10   that the car was towed?

11   A.   Yes.

12   Q.   And he clearly says that the car was not drivable?

13   A.   Yes.

14   Q.   You were asked about that tow money, the $400.  It

15   ultimately was returned by Cal's, right?

16   A.   Yes.

17   Q.   Not until after the IRS and the FBI went to Cal's with a

18   subpoena, correct?

19   A.   Yes.

20   Q.   You were asked some questions about that receipt for

21   payment, the acknowledgment of payment -- I think it's Exhibit

22   14 -- on Thayer Avenue.  Do you remember who did Mr. DeLuca say

23   he gave the $50,000 to?

24   A.   I believe he said it was to Mr. DeCicco.

25   Q.   Was Ms. Avedisian there?

1    A.   No.

2              MS. BARCLAY:  No further questions.

3              THE COURT:  Anything further?

4              MS. MINER:  Just a couple.

5                        RECROSS-EXAMINATION

6    BY MS. MINER:

7    Q.   Now, with respect to Exhibit 19, if you could -- that the

8    Government -- it was just introduced.  It's the front of a

9    check, right, to the RMV?

10   A.   Yes.

11   Q.   And that was given to you by Cal's?

12   A.   No.

13   Q.   Excuse me.  By Jeff Carroll, right?

14   A.   Yes.

15   Q.   If I could -- and did you look at Mr. DeCicco's bank

16   records for August of 2018?

17   A.   That's when we found the thirteen-fifty check, yes.

18   Q.   And you didn't see any $20,000 check going out, did you?

19   A.   No.

20             MS. MINER:  That's all I have.  Thank you.

21             MS. BARCLAY:  Nothing further.

22             THE COURT:  You may step down.

23             Does the Government have any further witnesses?

24             MS. BARCLAY:  No, Your Honor.

25             THE COURT:  Does the defendant have any witnesses?

```
 1              MS. MINER:  No, Your Honor.

 2              THE COURT:  Okay.  Why don't we take five minutes and

 3       then I'll hear you.

 4              MS. MINER:  Thank you.

 5              (Recording ends at 4:05:37)

 6              (Recording starts at 4:21:06)

 7              THE COURT:  Okay.  I'll hear from the Government.

 8              MS. BARCLAY:  Thank you, Your Honor.

 9              Your Honor, first, there is probable cause to believe

10       that Mr. DeCicco committed crimes while he was on pretrial

11       release.

12              First and foremost, he conspired to commit insurance

13       fraud.  He drove his damaged 2012 Corvette to a friend's shop,

14       and then while at the shop submitted a claim online saying it

15       was towed to the shop.  He submitted the claim.  It's filed by

16       Mr. DeCicco.  He misspelled the name of the street where the

17       shop is.  It's unlikely that Mr. Matarese or Mr. Lightbody

18       submitted the claim.  They would have known how to spell Argyle

19       Street.  And in the claim he says that the car was not drivable

20       and that it was towed.

21              And regardless of what the claim said, we heard his

22       voice on that tape, on that call, two days, three days later,

23       and he made two false statements to a Commerce representative,

24       one, that the car was not drivable, and two, that the car was

25       towed.  This enabled Cal's to submit a $400 bill for a tow that
```

1    Mr. DeCicco now admits never happened, and this resulted in a

2    $400 payment to Cal's.  And the fact that Cal's returned the

3    money after the FBI and the IRS went to Cal's with a subpoena

4    is irrelevant.  It doesn't change the fact that Mr. DeCicco

5    conspired with Cal's to get paid for a nonexistent tow.  This

6    is a violation of both state insurance fraud, Mass. General

7    Laws Chapter 266 Section 111B, and federal wire fraud laws, for

8    that matter.

9          Second, and, you know, it's unclear, but either

10   Mr. DeCicco spent $20,000 in August of '18 in violation of this

11   Court's order on a 2012 Corvette or he submitted a false RMV-1

12   to the Mass. Registry of Motor Vehicles.  He admitted that he

13   didn't buy -- or he's admitted that, he's taken the position

14   that he didn't buy the 2012 Corvette for $20,000 on August 27,

15   2018, yet he signed the RMV-1 application form stating that he

16   did.  And he personally signed it and filed it with the RMV.

17         He also paid the sales tax on that vehicle in August

18   of 2018 with that check.  I'd query why he'd pay tax for a

19   vehicle if he had in fact traded in a truck for the vehicle.

20   He wouldn't have owed sales tax.

21         THE COURT:  So you're saying that the check is the

22   Atlantis check?

23         MS. BARCLAY:  Yes.

24         THE COURT:  For the taxes?

25         MS. BARCLAY:  For the tax, the $1,350 which matches

1    Exhibit 1, the RMV-1.  So that's probable cause to believe that

2    he violated -- or that he violated state law.  And just to be

3    clear, it's Mass. General Laws Chapter 268 Section 1.  That's

4    the state perjury statute which applies to the RMV-1 form.

5         There is further clear and convincing evidence that

6    Mr. DeCicco violated multiple other conditions of release that

7    Your Honor imposed.  He admitted to Pretrial Services -- I

8    believe Your Honor has the report from Pretrial Services --

9    that he failed to report contact with the Nahant Police on

10   January 10th, 2019.  He was pulled over and didn't -- didn't

11   report that to Pretrial Services.

12        Mr. DeCicco doesn't get to decide what types of

13   contact with law enforcement should be reported and what

14   contact doesn't need to be reported.

15        He also has admitted -- he admitted in his response to

16   the Government's motion to revoke his pretrial release that he

17   had direct contact with Ms. Avedisian, his co-defendant, in

18   direct violation of Your Honor's stay-away order.  He was

19   warned several times -- they both were -- by Your Honor that

20   they were not to have any contact with each other except

21   through lawyers.  And he knew the procedure.

22        His lawyers have previously asked Your Honor for

23   contact, and it wasn't allowed.  And he doesn't get to decide

24   that he can have contact with her about some things, if he

25   decides to, without having a lawyer there.

1          There's also clear and convincing evidence that

2    Mr. DeCicco contacted Richard Aswad, who is on the Government's

3    witness list, through a third party who was not a lawyer.  This

4    is indirect contact.  On June 13th, 2008, Your Honor

5    specifically stated, and I quote, "There's going to be no

6    contact either directly or indirectly.  So you can't go through

7    anybody else to have somebody contact them," and that's on page

8    9 of that transcript.

9          There's also clear and convincing evidence that he

10   bought a Cadillac for $6,100 in November of 2018.  That's more

11   than $1,000.  He was barred from purchasing assets of more than

12   $1,000 without notifying the Government.  Money is an asset.  A

13   Cadillac is an asset.  There's nothing unclear about your

14   order.  There are no exceptions.

15         There's also clear and convincing evidence he was

16   involved in a real estate sale in violation of his conditions

17   of release and in selling an asset that is not in his name.

18   And there is no misunderstanding here.  The Government raised

19   concerns with Your Honor when we were discussing conditions of

20   release about Mr. DeCicco buying and selling real estate.  And

21   specifically over the course of the past few months, the

22   Government has raised the issue of this Thayer Avenue property

23   with the court and with defendants, and its concerns about him

24   using people as straws to conduct business.

25         The Court prohibited Mr. DeCicco from participating in

1    real estate sales and from buying and selling assets under

2    someone else's name.  This property is in someone else's name.

3    He negotiated the sale, and he expected to get money from the

4    deal under the table from the buyer hidden from the Government.

5           Your Honor, this is not a one-off violation case.

6    Mr. DeCicco has repeatedly committed crimes, willfully violated

7    multiple other conditions of release in the seven months he's

8    been on pretrial release.  His repeated noncompliance is the

9    best evidence that he cannot be -- he cannot abide by any set

10   of conditions of release.  And his proffered excuses for his

11   noncompliance only highlight that he's unlikely to abide by any

12   conditions of release.

13          And I just want to note, Your Honor, just because he

14   was held in a prior case and acquitted, that doesn't mean that

15   Mr. DeCicco doesn't have to obey Your Honor's release

16   conditions.

17          Mr. DeCicco poses a danger to the community,

18   particularly to insurers, and he should be detained pending

19   trial in this case.

20          And, in addition, the Government has asked that his

21   bail be forfeited to the Government.

22          THE COURT:  Okay.  Thank you.  Can I ask just -- well,

23   actually, let me ask you before you start.  On the $20,000 car

24   purchase --

25          MS. BARCLAY:  Yes.

1          THE COURT:  -- are you contending that violated

2     conditions or are you saying that it was just the fact that

3     there was the representation?  Do you have any evidence that

4     there was actually a cash transfer?

5          MS. BARCLAY:  There's no -- I mean, it's hard to have

6     evidence of a cash transfer, Your Honor.  There's no bank

7     record of a purchase, and we have what Mr. Carroll said and

8     what Mr. Aswad said and we have what the RMV-1 says.  But the

9     fact of the matter is, I mean, the RMV-1 is there for a reason,

10    right?  You sign it under penalties of perjury so that when

11    someone looks at your records in the RMV, they know what

12    happened.

13         THE COURT:  So -- but the contention, I gather, is

14    that it was the actual sale took place years before?

15         MS. BARCLAY:  The Government doesn't know.  We have no

16    evidence other than the word of Mr. Carroll and Mr. Aswad that

17    it took place years before.  And all we have in terms of

18    evidence from outside parties is the RMV-1 which shows

19    something different.  So either he bought it years ago and lied

20    on the form or he bought it in '18 and violated the conditions

21    of release.

22         THE COURT:  Thank you.

23         Ms. Miner?

24         MS. MINER:  Thank you.

25         Your Honor, with respect to the Corvette, there is no

1    evidence that Mr. DeCicco bought that car in 2018.  In fact,

2    all of the evidence in front of you is to the contrary.  Both

3    Aswad and Mr. Carroll were interviewed by FBI agents.

4    Mr. Aswad is cooperating with the Government in the case, so I

5    don't know why he would lie about it.

6         He said he had the car from before Mr. DeCicco went to

7    jail on behalf of Mr. DeCicco.  He was happy to give it back to

8    him.  Didn't want it, and asked Mister --

9         THE COURT:  I don't understand why he had the car in

10   the first place.  I'm just missing something here.

11        MS. MINER:  He had the car, and I think this was in

12   his statement, because when Mr. DeCicco went to jail, he was

13   going to try to sell the car on behalf of Mr. DeCicco.  But he

14   never did.  In fact, what happened is somebody tried to buy it.

15   It couldn't pass inspection so they gave it back to -- I

16   understand it's a complicated -- it doesn't make sense, but

17   that's what happened.  Sometimes things don't make sense.  It

18   was at Mr. Aswad's place, and he was trying to sell it for

19   Mr. DeCicco.  It wasn't sold by the time Mr. DeCicco gets out

20   of jail.  A mechanic says, oh, you know, Gary would like the

21   money -- the car back.  Unclear if Mr. DeCicco asked him to

22   reach out to Mr. Aswad or if the mechanic just as a friend

23   said, hey, look it -- you know, thought to himself or give it

24   back.

25        THE COURT:  I'm assuming somebody asked.  I'm assuming

1     somebody on behalf of Mr. DeCicco.  Is that an incorrect

2     assumption?

3            MS. MINER:  No, I don't think that's a fair

4     assumption.  People sometimes just do stuff on their own.

5            THE COURT:  That he's just going to return the $20,000

6     car?

7            MS. MINER:  Sure.  I mean, Mr. DeCicco obviously talks

8     a lot.  So he's talking --

9            THE COURT:  He's been remarkably quiet today.

10            MS. MINER:  Yes.  We're pleased.  Mr. DeCicco is

11    talking about, oh, this guy has my car.  I don't know how to

12    get it back.  I want my car back.  And the mechanic decides on

13    his own.  That's not unreasonable.

14            THE COURT:  Okay.

15            MS. MINER:  But in any event, he gets the car back.

16    And Mr. Aswad is the one that involves Jeff Carroll, not

17    Mr. DeCicco, and says, hey, will you get it back to him.

18    Probably because of the no contact order.  But Mr. DeCicco

19    isn't using Jeff Carroll.  Mr. Aswad was, and says will you pay

20    for it and get the car back to Gary DeCicco.

21            THE COURT:  So this is -- I'm sorry.  Where I'm -- if

22    he still owns the car, why does he have to file an RMV-1 at

23    all?

24            MS. MINER:  Well, he should haven't had to.  Well, I'm

25    not sure that he shouldn't have had to.  The title was

1    transferred.

2         THE COURT:  Then he didn't own it.

3         MS. BARCLAY:  The title --

4         MS. MINER:  It was the dealership.

5         MS. BARCLAY:  You can see on the form.  It was

6    actually in the name of Lynnway Auto before.  It wasn't in

7    Mr. DeCicco's name.

8         MS. MINER:  Dealerships are entitled to take cars --

9         THE COURT:  But Mr. DeCicco transferred the title of

10   this car, so it's not his.

11        MS. MINER:  No, that's not right.  You can -- auto

12   dealers are permitted to take consignment cars in their name to

13   effectuate the sale.  So if you take your car to a dealership,

14   for example --

15        THE COURT:  And he's supposed to reregister it back

16   into his name; is that the way it works?

17        MS. MINER:  Yes.  What should have happened

18   is -- well, there's two things that may have -- that should

19   have happened, if you want my opinion.  One is they just say it

20   was a transfer for transfer.

21        Now, he probably still owes sales tax on that because

22   the testimony was that Mr. DeCicco originally got the car

23   because he transferred a truck in return for the car when he

24   originally owned it.

25        THE COURT:  I'm sorry.  I hate to be dense, but since

1   you're all wanting me to understand all motor vehicle transfers

2   on Friday afternoon, you have to explain it to me.  Okay?

3   Somebody files an RMV-1 because -- there's an application

4   because there's a transfer of title, all right?

5           MS. MINER:  You have to file an RMV-1 if there is a

6   transfer of title except to a registered auto dealer.  So if I

7   went and -- if I want to sell my car, and I take it to the

8   dealership, I can agree that they take it in their name on

9   consignment.  It doesn't mean that they own it.

10          THE COURT:  So that's a nontaxable event?

11          MS. MINER:  That's an untaxable event.  That's part of

12  what Ms. Barclay was talking about.  If you're a dealer, you

13  can transfer cars between dealerships, et cetera, without

14  paying taxes on it.

15          THE COURT:  But when the dealership -- so you're

16  saying that when the dealership returns basically the car to

17  Mr. DeCicco, they should not have filed --

18          MS. MINER:  They should not have put the $20,000 down

19  there.  It should have been zero.

20          THE COURT:  And shouldn't have paid any taxes?

21          MS. MINER:  I don't think they should have paid any

22  taxes.  Mr. Carroll paid the tax but --

23          THE COURT:  All right.

24          MS. MINER:  It is our -- I mean, because Mr. Carroll

25  apparently was aware of all of the prior transactions, maybe he

1  thought that, okay, he did get value for the car originally.

2  But, no, it should have been a zero.  Or if they wanted to talk

3  about the trade-in in the past -- but I'm sure that would have

4  raised questions if a car dealership transfers title to

5  somebody for zero dollars.

6       But in any event, I don't think that there's anything

7  that suggests that Mr. Carroll somehow did this nefariously.  I

8  mean, he was doing this on behalf of Mr. Aswad.  It was not

9  favorable to Mr. DeCicco.  He's the middle person.  He fills

10  out the forms.  It wouldn't make any sense for Mr. DeCicco to

11  say put down 20 grand.  That would be totally against his

12  interest.  And if that were the case, why would Mr. Carroll pay

13  the tax?

14       THE COURT:  But Mr. DeCicco signed it.

15       MS. MINER:  He did sign it, absolutely.  He signed it

16  to get the car transferred back to him.

17       THE COURT:  And he says he bought it for $20,000.  I

18  mean, that's what he says here.

19       MS. MINER:  He does say that, but it doesn't say when

20  he bought it for $20,000.

21       THE COURT:  So did he buy it for $20,000 or he bought

22  it for a truck?

23       MS. MINER:  He bought it with a truck which --

24       THE COURT:  Okay.

25       MS. MINER:  You know, the value of it was for 20 grand

1    for all I know.  But the point is it's convoluted.  But he

2    owned the car to begin with.  He owned the car at the end.  He

3    didn't buy anything.  It was a convoluted way to get a car that

4    Mr. DeCicco owned back to Mr. DeCicco.  So there's no violation

5    in terms of whether he was transferring assets or not.

6           The RMV thing is what it is.  It was to transfer

7    title.  It was filled out by Mr. Carroll.  Mr. DeCicco signed

8    it.  We're not disputing that.  Why somebody thought $20,000

9    needed to be put on there, God knows.  And maybe they're right.

10   I don't even know.  But it's a convoluted way to get his asset

11   back to him.

12          He then gets in an accident with the car.  There's no

13   dispute that there's a real accident here.  I mean, there's

14   pictures.  The insurance company goes out, appraises the

15   injury, and it determines that it's seventy-one-hundred-

16   and-some dollars.

17          It's clear that the claim was submitted.  The

18   Government's Exhibit at 12/30, on whatever date it was,

19   Mr. DeCicco was there.  But the thought that Mr. DeCicco was

20   actually sitting at one of Cal's Auto Body's computers is a

21   little odd.  It's most likely that somebody at Cal's filed the

22   claim on Mr. DeCicco's behalf.

23          THE COURT:  I have no idea.  I don't know that that's

24   at all likely.  If you're telling me that I'm supposed to

25   believe this motor vehicle thing is unlikely or likely, I don't

1    think it's a fair assumption.

2           MS. MINER:  A claim was submitted.  We don't know who

3    submitted it.  It was submitted on behalf of Mr. DeCicco.  I

4    suggest that it's just as likely that somebody from Cal's Auto

5    Body, maybe more likely, because, let's face it, they are the

6    ones who submitted the claim for the towing and they are the

7    ones that thought the money was going to them, not to

8    Mr. DeCicco.  It turns out the insurance company didn't agree

9    with that.

10          But Cal's Auto Body is the one that wants the $7,100

11   and wants the $400.  There's no evidence that Mr. DeCicco knew

12   that Cal's Auto Body phonied up a towing receipt, and there's

13   no question that Mister -- that Cal's Auto Body phonied up a

14   towing receipt.  It's Exhibit 8.  There's no evidence that

15   Mr. DeCicco knew about that.  And what benefit was he going to

16   get from it?  None.  The only person that would have benefited

17   from this is Cal's Auto Body.  And maybe it was a legitimate --

18          THE COURT:  I have to say that this claim says, "Do

19   you plan on getting your vehicle repaired?"  It says, "No."  It

20   seems to me unlikely that the car repair place on its own would

21   say that it's deserving of the check but it doesn't intend to

22   fix the car.  That doesn't -- it's on --

23          MS. MINER:  I understand --

24          THE COURT:  -- the second-to-last page.

25          MS. MINER:  -- that that's what it says, Your Honor.

1          THE COURT:  That also is --

2          MS. MINER:  But it also doesn't make sense that he

3     leaves the car there, you know, expecting it to get fixed at

4     some point.  It's still there, by the way.  And apparently

5     they're keeping it there.  It isn't drivable.  I suppose he

6     could have it towed to his house.

7          But, again, it's all very convoluted.  But the bottom

8     line is he had an accident.  He didn't submit the claim for the

9     towing.  Cal's Auto Body did.  Cal's Auto Body was going to get

10    the $400.  In fact, they did get the $400.  No evidence that

11    Mr. DeCicco did that.  And that they give it back when the FBI

12    comes calling and they say it's a mistake.  Maybe it was a

13    mistake.  Maybe it was intentional.  We don't know.

14         THE COURT:  What about the phone call?

15         MS. MINER:  The phone call, again, is -- the phone

16    call is not a claim.  The insurance company is calling

17    Mr. DeCicco and asking him what is the damage to the car.  And

18    he says, well, the right side is all smashed in.  It's got a

19    broken wheel.  They say something, well, what about the left

20    side?  I don't know.  It was towed.  I think it was -- it was a

21    mistake, obviously.  We're not alleging that it was true.

22    We're not -- you know, it was Mr. DeCicco's way of saying I

23    don't know what the damage is.  I didn't pay much attention to

24    it, which, you know, I don't know; is he afraid he is going to

25    say too much?  Is he afraid he's going to say too little?

1    Obviously he should have said I don't know.  That would have

2    been the easiest answer for him to say and let them go figure

3    it out, which they are going to do anyway, by the way.

4    Obviously insurance companies go take pictures, assess the

5    damage, make the damage amount themselves.

6             With respect to Thayer Avenue, Your Honor, it's not

7    like Mr. DeCicco was working in real estate or -- the

8    Government knew about this from at least February.  And in

9    February they're telling Mr. DeLuca's lawyer -- it's one of the

10   exhibits we put in.  We just got them today so I didn't have

11   extra copies, but I think -- I don't know which number it is.

12            THE COURT:  Which one do you want?

13            MS. MINER:  It's the one with the big print at the

14   bottom.  And I don't want it.  I just want Your Honor to look

15   at it.  It says --

16            THE COURT:  Is this the one that says we're going to

17   negotiate over the sale?  We're going to inform the Government

18   of the sale?

19            MS. MINER:  It's number 18, Your Honor.

20            THE COURT:  Okay.  I have that.

21            MS. MINER:  They say if you want to reach out -- they

22   kept telling Mr. DeLuca's lawyers reach out to lawyers for

23   Mr. DeCicco and Ms. Avedisian.  And as you know, they have

24   separate lawyers.  So the Government was well aware of this

25   transaction, and they're telling them to go reach out to

1    Mr. DeCicco's lawyers.

2          And this transaction has already -- there's no straw.

3    It's been approved.  They've looked at it 100 different ways.

4    And in part of the thing with -- it's still not totally

5    finalized, as I understand it.  I think money is still in

6    escrow, and Mr. DiMento is waiting for another order from the

7    Court.  But the bottom line is the Government approved it.

8    Your Honor approved it.  So I don't see how any of that is a

9    violation of any condition of release.

10         The only thing that is a violation of his condition of

11   release in connection with Thayer Avenue -- and we admit it and

12   it shouldn't have happened -- is Mr. Fautz says, "I want to see

13   Ms. Avedisian.  Bring me over." And Mr. DeCicco stupidly does.

14   It was stupid.  He should have said, no, we'll set up an

15   appointment.  No, you know, let's call Mr. DiMento, who he's

16   been dealing with.  There's hundreds -- not hundreds.  There's

17   scores of calls from Mr. DeCicco to Mr. DiMento, which the

18   Government knows and Mr. Elio testified.  Obviously that's what

19   they should have done.  I don't know if it's -- you know, but

20   he didn't.  He didn't think.  He brought the man over,

21   introduced him to Pam.  The man saw that Pam exists and they

22   left.  I mean, it shouldn't have happened.  We're not

23   arguing -- we're admitting that not only today but in our

24   motion.  It was incidental.  There was nothing substantive.

25         But I would suggest that there is -- that's -- that

1    doesn't rise to the level of safety to the community or risk of

2    flight which they argue.

3             The other -- I think that's all of them.

4             THE COURT:  The purchase of -- the $6,100 purchase?

5             MS. MINER:  You're right, Your Honor.  All of this

6    happens simultaneously -- no, within the same period of two

7    weeks.  Mr. DeCicco gets his Corvette back.  It then gets in an

8    accident.  He gets a check from the insurer, and he buys

9    another car in his own name.  Not in his daughter's name, which

10   I think it was because of the Court's order that he can't

11   transfer assets to somebody else.  But from his perspective,

12   it's all the same, right?  I mean, his net worth is actually --

13   stays the same.  He had a car, the Corvette to begin with, so

14   that didn't change his asset situation.  He gets $7,100.  And

15   he buys a car for sixty-one from somebody at totally arm's

16   length.  In fact, it's over the Internet, and the Government

17   talked to the buy -- or the seller and said, yeah, he said he

18   was buying a car for his daughter.  Now, it turns out he didn't

19   put it in his daughter's name.  He put it in his name, which is

20   I think what he was supposed to do.  But his net worth didn't

21   change at all from that transaction.  He now has a damaged

22   Corvette and --

23            THE COURT:  Is that your understanding of the

24   conditions, that it's an evaluation of net worth or is it a --

25   as I read the conditions or I assume the conditions mean it's

1    expenditures over $1,000.  Why is this not covered?

2           MS. MINER:  Your Honor, the question is of intent.  I

3    think --

4           THE COURT:  No, no, no.  Before you get to intent, I

5    want to know whether you think it violates the conditions?

6           MS. MINER:  I do.  I do.  I think it should have all

7    been approved.  I think it all would have been approved.

8           THE COURT:  Could have been, perhaps.

9           MS. MINER:  But if part of -- my understanding is that

10   part of the intent of the order is Mr. DeCicco does not

11   dissipate assets.  If that's the intent of the order -- I admit

12   it's a violation.  It's a technical violation.  I'm not hiding

13   that.  Again, Mr. DeCicco should have talked to lawyers before

14   he does these.

15          And certainly I -- you know, I would have advised him

16   let's just file a motion.  It might have taken an extra week or

17   two, but no reason to think it wouldn't have been allowed.

18   It's a pretty minor transaction in the scheme of things,

19   especially since it did not affect his net worth at all.

20          THE COURT:  It gets a little more complicated when you

21   have to explain the whole first car as part of this.

22          MS. MINER:  I'm not sure you would have had to --

23          THE COURT:  Well, the check had to come from

24   somewhere.

25          MS. MINER:  Well, that's true, but it would have come

1   from -- I mean, you'd have to explain that it was in an

2   accident.  Correct, you'd have to explain that.  But, again, I

3   don't think there's any dispute that it was the accident.  I

4   mean, the accident took place.  The car is a mess.  I mean,

5   there's the pictures of it.  It doesn't look drivable.  He

6   drove it to Cal's Auto Body when he probably shouldn't have and

7   maybe it damaged it more.  God knows.  But there was the

8   accident.  And I don't think that there's any intent not to

9   seek court approval because they were afraid to find out that a

10  Corvette was in an accident.  I mean, accidents obviously

11  happen.

12         And I think that covers all of them.  Am I missing

13  something?  It's Friday afternoon.  Not that that's not enough,

14  I mean, obviously.

15         THE COURT:  Nothing is coming to my mind at the

16  moment.

17         MS. MINER:  Fair enough.  It came to my mind, too.  I

18  mean -- but, Your Honor, yes, there were a lot of technical

19  violations, but they don't rise to the level of revoking his

20  conditions of bail.  They were stupid.  They were violations.

21  But, no, I mean -- but in the scheme of things, they're

22  convoluted, but they're not hurting anybody.  They're not, you

23  know, having people transfer assets in somebody else's name.

24  It's not dissipating assets.  He's not a flight risk.  Yes, he

25  shouldn't have done it.  And yes, there are too many tiddly

1    things.  It shouldn't have happened.  I'm making no excuses for

2    it.  I'm just trying to explain the context in which they

3    happened.

4            Thank you.

5            THE COURT:  Do you want to respond?

6            MS. BARCLAY:  No, Your Honor, except to say, you know,

7    if the Government had been asked about the purchase of the

8    Cadillac, we would have said what's the source of the funds.

9    We would have found the insurance check.  We would have checked

10   into the claim because it would have concerned us, and we would

11   have found out about the false tow.  That's why Mr. DeCicco

12   didn't tell the Government about the expenditure.

13           So there's no innocent explanation for these repeated

14   violations.  And they are not just technical violations.  They

15   are significant violations of orders that Your Honor repeated

16   over and over again to Mr. DeCicco.  And the Government is not

17   convinced that he will learn from this.

18           THE COURT:  Okay.  I'm going to continue this hearing.

19   I think there's -- frankly, there's no question that there are

20   violations.  I'm not sure how many but there are.  I need to

21   look through the papers.  I'm not sure, frankly, what the

22   Government -- what my response is to that, but I do think that

23   there's a problem.  I do think there's a real problem here.

24           I'm going to continue this and deal with your other

25   motion to modify conditions of release at the continued

```
 1   hearing.  I'm not going to deal with it now.
 2             MS. MINER:  That's fine, Your Honor.
 3             THE COURT:  I know -- are you on trial?
 4             MS. MINER:  Yes.  If we could have either a nine --
 5   I'm on trial 10:00 to 4:00 in front of --
 6             THE COURT:  Judge Burroughs?
 7             MS. MINER:  Judge Burroughs.  So if we could have a
 8   9:00 a.m. or a 4:00 p.m.?
 9             THE COURT:  Yes, we can do a -- Tom?
10             THE CLERK:  Do you want to do Wednesday, the 27th, at
11   12:30?  You are doing an ADR during the day.
12             THE COURT:  What about Tuesday?
13             THE CLERK:  Tuesday, the 26th, we could do 4:30.
14             THE COURT:  No.  We'll do it Wednesday.  Wednesday at
15   4:30.
16             MS. MINER:  Wednesday, the 27th, Your Honor?
17             THE COURT:  Yes.
18             MS. MINER:  That's fine, Your Honor.  Thank you.
19             THE COURT:  All right.  This matter is cont --
20             MS. BARCLAY:  I'm sorry.  You said Wednesday, not
21   Tuesday?
22             THE COURT:  Wednesday.  Does that work?
23             MS. BARCLAY:  Yes, Your Honor.
24             THE COURT:  Okay.  This matter is continued until
25   Wednesday.
```

1          MS. MINER:  Thank you.

2          MS. BARCLAY:  Thank you.

3          THE COURT:  Thank you.

4          THE CLERK:  Court is in recess.

5          (Recording ends at 4:50:40)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the audio-recorded proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9                    Dated this 3rd day of November, 2020.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25