```
                     UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


                                     )
   UNITED STATES OF AMERICA,         )
                                     )
            Plaintiff,               )
                                     )   Criminal Action
   v.                                )   No. 1:18-cr-10013-RGS
                                     )
   GARY P. DECICCO,                  )
                                     )
            Defendant.               )
                                     )



            BEFORE THE HONORABLE JUDITH G. DEIN
                UNITED STATES MAGISTRATE JUDGE


             BOND REVOCATION HEARING - DAY 2


                      March 29, 2019


         John J. Moakley United States Courthouse
                    One Courthouse Way
                Boston, Massachusetts 02210




                  Linda Walsh, RPR, CRR
                 Official Court Reporter
         John J. Moakley United States Courthouse
              One Courthouse Way, Room 5205
                Boston, Massachusetts 02210
                  lwalshsteno@gmail.com
```

```
 1     APPEARANCES:

 2     On Behalf of the Government:

 3          UNITED STATES ATTORNEY'S OFFICE
            By: AUSA Kristina E. Barclay
 4          1 Courthouse Way, Suite 920
            Boston, Massachusetts 02210
 5          617-748-3371
            Kristina.barclay@usdoj.gov
 6

 7     On Behalf of the Defendant:

 8          MINER ORKAND SIDDALL LLP
            By: Tracy A. Miner, Esq.
 9              Megan Siddall, Esq.
            470 Atlantic Avenue, 4th Floor
10          Boston, Massachusett 02210
            617-273-8421
11          tminer@mosllp.com

12

13

14             Proceedings recorded by sound recording and
                 produced by computer-aided stenography.
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              (Recording begins at 3:40:03)
 3              THE CLERK:  The United States District Court for the
 4    District of Massachusetts is now in session on March 29, the
 5    year 2019, in the matter of United States of America versus
 6    Gary DeCicco, Criminal Case Number 2018-10013.
 7              Could counsel please identify themselves for the
 8    record.
 9              MS. BARCLAY:  Good afternoon, Your Honor.  Kristina
10    Barclay for the United States.
11              THE COURT:  Good afternoon.
12              MS. MINER:  Good afternoon, Your Honor.  Tracy Miner
13    and Megan Siddall for Mr. Gary DeCicco.
14              THE COURT:  Okay.  So I think -- I've been looking at
15    this, but I wanted to give everybody a chance for further
16    argument on it.  I think that makes sense for me.  Okay.  So if
17    there's anything else that you want to add or sum up where you
18    think we are?
19              MS. BARCLAY:  Well, Your Honor, I think where we left
20    off last Friday was that essentially Mr. DeCicco, through
21    counsel, admitted that he had violated his conditions of
22    release.
23              He certainly conspired to commit insurance fraud with
24    Cal's Auto Body.  I know Your Honor had the exhibits, and the
25    tape is crystal clear that that is Mr. DeCicco stating that his
```

1  car was towed even though it wasn't.  It resulted in a $400
2  payment to Carl's Auto Body that they ultimately returned after
3  the IRS and the FBI came knocking and the jig was up.
4          You also have either it's a false statement on an
5  RMV-1 or it's a $20,000 transaction without the permission of
6  the United States Attorney's Office or would have notification
7  to us or Pretrial Services for the Corvette in August of 2018.
8          He admittedly failed to report contact with the Nahant
9  Police.
10         He admitted he had direct contact with Pam Avedisian
11 even after he was warned several times that he wasn't to have
12 contact with her.
13         There's clear and convincing evidence that he
14 contacted Mr. Aswad, someone on the Government's witness list,
15 through a third party who was not a lawyer.  It's indirect
16 contact in violation of Your Honor's order and your specific
17 direction not to contact people through third parties.
18         There's clear and convincing evidence that he bought a
19 Cadillac for $6,100 in November of 2018.  Again, that's more
20 than a thousand dollars.  There was no notice to the
21 Government, no notice to Pretrial Services, nothing.
22         And there's clear and convincing evidence that he was
23 somehow involved in a real estate sale for a property that
24 wasn't in his name.  So that also violates several conditions
25 of his release, and that's the Thayer Avenue property.

1              As I said on Friday of last week, this is not a
2     one-off violation case.  This is not I contacted Pam Avedisian
3     once and the Government filed a motion to revoke.  This is
4     repeated and constant violations since basically he got out of
5     jail last year.
6              His repeated noncompliance is essentially the best
7     evidence that he cannot abide by any of the release conditions.
8     And his excuses for his noncompliance only highlights that he's
9     unlikely to abide by additional conditions.
10             It's the Government's position that DeCicco poses a
11    danger to the community, particularly to, you know --
12    particularly with respect to the insurance fraud conspiracy,
13    and admittedly violating stay-away orders, which Your Honor
14    advised him are very important.
15             Because he's unlikely to abide by conditions of
16    release, that he poses a danger to the community under the
17    applicable statute, he should be detained pending trial.  And
18    in addition, his bail -- I can't remember exactly how much it
19    is -- but it should be forfeited as well.
20             THE COURT:  Okay.
21             MS. MINER:  Thank you, Your Honor.
22             Mr. DeCicco has admitted two violations, both minor.
23    One, he did have direct contact with Pam Avedisian at the
24    request of the buyer of the -- the purchaser of the Thayer
25    Avenue property.  They were present negotiating.  He was

1  negotiating through Frank DiMento.  Obviously he should have
2  called Mr. DiMento and ask to meet at Mr. DiMento's office.
3          The guy challenged him and said, "I don't even know
4  that this woman exists."  He drives her over, but that's it.
5          He also admitted he bought the Cadillac in his name.
6  It was over $1,000.  It did violate -- he should have gotten
7  permission.  He used -- his view was he didn't dissipate any
8  assets.  He didn't takes assets away from the Government.
9          With respect to the sale -- the real estate sale on
10 Thayer Avenue, that was approved by the Court and everybody
11 knew --
12         THE COURT:  No.  It was -- just for the record, my
13 memory is it was approved by the Court after the Government
14 found out about it.
15         MS. MINER:  Yes.
16         THE COURT:  But it was part of what was supposed to be
17 disclosed in an orderly fashion and discussed, and then we had
18 to create a whole new system for it.
19         MS. MINER:  I understand -- I do understand.
20         THE COURT:  So this is not the one to go down.
21         MS. MINER:  I read the transcripts.  It was
22 brought -- it was brought up in hearings.  There was another
23 procedure put in place.  But there was no question that
24 Mr. DeCicco was involved in the sale of it and that he felt
25 that he could be involved.  It wasn't an asset in somebody

```
 1   else's name.  It's in Ms. Avedisian's name.  It wasn't -- he
 2   wasn't being paid to ask to help her.  So he wasn't in real
 3   estate.
 4           He was heavily involved in the negotiations.  There's
 5   no question about that.  It was not a question where it's, as I
 6   understand it, Ms. Avedisian's money.  It's Ms. Avedisian's
 7   property.  There's been no proof otherwise from what I've read
 8   in the transcripts.
 9           And yes, Mr. DeCicco was involved in negotiating.  He
10   was trying to help Ms. Avedisian out, and he was dealing mainly
11   through Mr. DiMento, which the Government recognizably brought
12   out, that there were all of those calls from Mr. DeCicco to
13   Mr. DiMento.  He was trying to follow the lawyer rule.  He
14   messed up one time.
15           With respect -- there's no -- he did get his car back
16   from Mr. Aswad.  I think a call to the mechanic to see if
17   Mr. DeCicco asked him to do that.  I think it's just as likely
18   that Mr. DeCicco is saying, hey, complaining about his car and
19   how do I get it back.  Yes, again, maybe the mechanic acted on
20   his own to try to help Mr. DeCicco.  Again, Mr. DeCicco could
21   have called his lawyer, there's no question about that, and got
22   the car back.  It would have been the same transaction.
23           And I'm not blaming anybody.  I'm just trying to
24   explain the situation, as Your Honor knows, and it's still the
25   case.  I'm only in for purposes of bail.  Mr. DeCicco has had
```

1   difficulty finding lawyers.  Yes, Mr. Cipoletta is still in the
2   case.  But that's different than taking calls from clients
3   every day when you're being paid.  And, you know, whether
4   Mr. Cipoletta didn't call him back, whether he didn't call
5   enough, he clearly should have been going through counsel.
6   There's no question about that.
7           With respect to Cal's Auto Body, you heard the tape,
8   Your Honor.  He did say that the car was towed.  He was making
9   up an excuse as to why he didn't know the amount of damage.
10  Cal's Auto body submitted that claim without -- and there's no
11  evidence that Mr. DeCicco told them to, asked them to.  They
12  submitted the claim.  They got paid on it.  They returned it,
13  saying it was a mistake.
14          You know, Mr. DeCicco wants to comply.  I can tell you
15  I've been in contact with him almost daily on anything that
16  might touch upon the Court's order.  And that's just the
17  way -- and he's willing to do that, and he apologizes.  He's
18  made mistakes.  But nobody was hurt.
19          I submit that most -- the contact with the police, it
20  was -- it wasn't even a written warning.  He really did not
21  think that was something that needed to be reported.  It was a
22  friend of his.  They stopped.  They chitchatted.  No written
23  warning.  I'm not even sure you have to report a written
24  warning.  I would tell my clients to to be conservative.  But
25  it certainly -- if somebody stops and chitchats with you, that

1   is akin if he went through the marshals downstairs with his
2   phone and they said, "Hey, Mr. DeCicco, you have got to go
3   check it in."  I wouldn't necessarily think that's a reportable
4   thing.  Again, to be 100 percent conservative at this point, I
5   would say report anything.  If a police officer says hello to
6   you, we will report it.
7          You know, Mr. DeCicco understands that he has to be
8   100 percent compliant and he has to -- if there's a question,
9   he should take it on the conservative side, not just act.  He's
10  aware of the problems.  He obviously was held before pretrial.
11  He knows how difficult it is to defend a case when you
12  don't -- can't have daily contact with your lawyer.  He wants
13  to get this case on track.  He wants to defend himself.  He was
14  acquitted in the last case.  He believes he will be acquitted
15  in this case.  There was a series of unfortunate events, and
16  we're just asking the Court to give him another chance given
17  the nature of the violations.
18          MS. BARCLAY:  Just one quick factual issue, Your
19  Honor, on the Thayer Avenue property.  I believe Ms. Miner said
20  he wasn't being paid to help Ms. Avedisian.  Special Agent Elio
21  testified that the buyer of the property told him that DeCicco
22  asked for anywhere between $75,000 and $100,000 from the
23  property.
24          And I will say to Your Honor that I had a conversation
25  with Mr. DiMento where he basically -- you know, I said we'll

1   only approve this sale if none of the money goes to
2   Mr. DeCicco, and his answer was he was going to get a loan from
3   Ms. Avedisian from the proceeds of the sale of this asset.  And
4   I said we will not approve that.  The money -- if it's
5   Ms. Avedisian's property, then it's her money, and the money
6   should not be then loaned back to Mr. DeCicco.  And those were
7   the conditions under which the Government -- so the only reason
8   he didn't get any money from this property is because we said
9   no.
10            MS. MINER:  Your Honor, on those two points only.
11  With respect to the consulting contract, yes, Mr. DeCicco
12  discussed a potential contract -- a consulting contract for the
13  properties to help manage the property after the buyer owned
14  it.
15            In earlier conversations, again, in this Court in the
16  transcripts, said once something is concrete bring it to the
17  Court, bring it to the Government.  The negotiations never got
18  to an agreement, let alone a signed agreement.  Yes,
19  Mr. DeCicco was aware that if he was going to try -- if he
20  wanted to do that, he would have to come to the Court.  He
21  would have to present it to the Court.  We assumed the
22  Government would never approve of anything he does.  That's
23  just the way it is.  We understand that.
24            With respect to the money, the Government would only
25  agree if Mr. DeCicco did not benefit, left the caveat that

1   Mr. DiMento could petition the Court to change that.  I believe
2   there has been a motion filed to that effect.  I don't know
3   that.
4           THE COURT:  No, not that I'm aware of.
5           MS. MINER:  All right.  Well, it was my understanding
6   that there was going to be, so just...
7           But the fact of the matter is it's not like if
8   Mr. DiMento wants to change that he can file a motion with the
9   Court, but I don't see how that's any violation or proof that
10  Mr. DeCicco owned the property.  If Ms. Avedisian wants to lend
11  Mr. DeCicco money, it's her money.  She can lend it to him.
12  Again, we'd have to come to the Court -- or she would have to
13  come to the Court and ask the Court's permission, but that's
14  the process that's in place.
15          THE COURT:  Okay.  So I find that Mr. DeCicco has
16  violated conditions of release and has done so repeatedly.  And
17  I find it very frustrating.  When this case started, the
18  conditions were agreed upon, and they were presented to the
19  Court as conditions that the parties had agreed to.  So it is
20  kind of surprising, the level of attempts that Mr. DeCicco has
21  gone to to circumvent those conditions.
22          In particular, without rehashing all of the evidence,
23  I do -- I do believe he participated in an insurance fraud in
24  the amount of $400.  I do believe he said that the car was
25  towed.  The evidence to me, it's more likely than not, that he

1  participated, if he did not actually file the claim, since his
2  name was on it and he was aware of it and he repeated that
3  information to the insurance agent.  I don't remember who.  The
4  claims adjuster on the phone.
5       I do believe that he knew that buying the Cadillac was
6  inappropriate.  I don't understand this truck at all.  I have
7  an RMV that says $20,000 on it.  This has always been a
8  financial crime, and I think Mr. DeCicco has been in front of
9  me enough times to know that we've been talking about
10 continuously how not to engage in large transactions without
11 the Government's knowledge.  That was the fundamental agreement
12 that was presented to me, and that has been refined over the
13 months that we have seen each other in court, far more often,
14 frankly, than I see people in most other cases.  All right.
15      I am not prepared to forfeit the bond over these,
16 though.  I don't think that that's an appropriate remedy.  I do
17 believe that there needs to be a way to limit his ability to
18 interact with others.  I'm not quite sure where the best way
19 for that is, but I think for now what I'm going to do is I will
20 keep him out of jail because I believe the case needs to be put
21 together and move forward, but the curfew -- he can only be out
22 of -- you're on electronic monitoring.  You can be out from
23 9:00 a.m. to 4:00 p.m.  All right.  And that's it.
24           MS. MINER:  Your Honor, only because I'm currently on
25 trial to 4:00, if it's to meet with me, could it be after 4:00?

1            THE COURT:  Let me see -- if you enter an appearance
2    here, we can have a conversation.  Right now I don't have you
3    as counsel --
4            MS. MINER:  I know.  But I am still in for bail
5    purposes.  And what I do is try, if there's any question at
6    all, to advise him of what to do.
7            THE COURT:  No.  His curfew is 9:00 to 4:00.
8            MS. MINER:  Thank you.
9            THE COURT:  All right.  He can work around it.  If
10   there's an -- you know, he can be out from 9:00 to 4:00.
11           I don't know that I'm doing the right thing.  I mean,
12   I don't know that you're not going to be here again,
13   Mr. DeCicco.  But I can tell you that if -- I'm tired of
14   playing the games and of trying to analyze what your financial
15   transactions are.  I think I have made myself as clear as
16   possible that any significant transaction needs to be reported
17   to the Government over $1,000.  That's it.  If I hear of any
18   other indirect contact, you're going to jail.  And I'm done
19   trying to ponder out the best way to keep this going.
20           I do have an old motion here for you to be able -- not
21   an old motion.  This came in as part of this motion.  That's
22   not what you were talking about?  You were talking --
23           MS. MINER:  No.  I was talking about -- I was under
24   the understanding that Mr. DiMento was going to file a motion.
25   I filed a motion --

1             THE COURT:  Okay.  That motion I don't have or that
2    I'm aware of somewhere in this.
3             MS. MINER:  Right.
4             THE COURT:  I do have the motion so that the two
5    defendants can have contact with each other.  That's denied.
6    All right?
7             Ms. Barclay, I understand your frustration here.  I
8    really do.  But I am constrained somewhat by the danger to the
9    community and risk of flight criteria that I have.  The only
10   way I know how to make sure that Mr. DeCicco understands the
11   severity of the situation is to make this as -- I don't know
12   how to make it any clearer, actually.
13            And it's Friday afternoon, and I clearly can't come up
14   with any more words.
15            This is the most leeway I'm going to give you.  All
16   right.  All of the --
17            THE DEFENDANT:  I'm sorry.
18            THE COURT:  You tell me you're sorry every time, okay?
19   But we've now had it spelled out as often as we can.  I don't
20   want to know that your third cousin fourth removed who you
21   called entered into a transaction on your behalf.  If there is
22   financial transactions being undertaken on your behalf
23   involving any of the assets that are at all at issue in this
24   case or can be at issue, you need to notify the Government
25   beforehand.

1        THE DEFENDANT:  I will.

2        THE COURT:  All right.  And I think that the energy
3   that is going into circumventing -- attempting to circumvent
4   these restrictions does not bode well for your -- for giving me
5   any assurance that you can comply with less restrictive
6   requirements.  Okay?  So this is it.  The same requirements
7   continue.  Your curfew is now restrained.  You are to remain in
8   the home except for 9:00 to 4:00 and still remain on electronic
9   monitoring.

10       And this really is the last time we're going to have a
11  substantive hearing on this.  So don't have the Government come
12  and report anything else to me.  Okay?

13       THE DEFENDANT:  Thank you.

14       THE COURT:  Thank you.

15       MS. MINER:  Thank you, Your Honor.

16       MS. BARCLAY:  Thank you.

17       THE CLERK:  Court is in recess.

18       (Recording ends at 3:58:36)

```
 1                CERTIFICATE OF OFFICIAL REPORTER
 2
 3          I, Linda Walsh, Registered Professional Reporter
 4   and Certified Realtime Reporter, in and for the United States
 5   District Court for the District of Massachusetts, do hereby
 6   certify that the foregoing transcript is a true and correct
 7   transcript of the audio-recorded proceedings held in
 8   the above-entitled matter, to the best of my skill and ability.
 9              Dated this 3rd day of November, 2020.
10
11
12              /s/ Linda Walsh
13              Linda Walsh, RPR, CRR
14              Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```